CITRONELLE–MOBILE GATHERING, INC., et al., Plaintiffs-Appellants,

v.

James B. EDWARDS, Secretary of Energy, et al., Defendants-Appellees.

Nos. 5–60, 5–61.

Temporary Emergency Court of Appeals.

Argued Oct. 9, 1981.

Decided Jan. 21, 1982.

Keith A. Jones, Fulbright & Jaworski, Washington, D.C., with whom Campbell Killerfer and John M. Simpson, Washington, D.C., of the same firm; and G. Sage Lyons and John P. Courtney, III, Lyons, Pipes & Cook, Mobile, Ala., were on the brief for plaintiffs-appellants.

Brian G. Kennedy, Civil Division, Dept. of Justice, Washington, D.C., with whom Stuart E. Schiffer, Acting Asst. Atty. Gen. and R. John Seibert, Washington, D.C., of the same agency; and Larry P. Ellsworth and Diana D. Clark, Office of Gen. Counsel, Dept. of Energy, Washington, D.C., were on the brief for defendants-appellees.

James F. Flug, Ruth M. Weisgall, Lee Ellen Helfrich, Lobel, Novins & Lamont, Washington, D.C., for the State of California, amicus curiae.

John P. Mathis, Catherine C. Wakelyn, Baker & Botts, Washington, D.C., and John F. Salisbury, Alden F. Whitehead, John F. Hornbostel, Jr., New York City, National Distillers and Chemical Corp. for Nat. Distillers and Chemical Corp. and Nat. Hydrocarbons, Inc., amicus curiae.

David L. Roll, Richard H. Porter, Carol A. Rhees, Steptoe & Johnson, Washington, D.C., for Texaco, Inc., et al., amici curiae.

Before SPEARS, HEMPHILL and POINTER, JJ.

HEMPHILL, Judge.

This litigation involves four cargo shipments of crude oil which were sold and shipped from appellants, Citronelle-Mobile Gathering, Inc. ("Gathering"), and Citmoco Services, Inc. ("Citmoco"), to the Grand Bahamas Petroleum Company ("PETCO") in the commonwealth of the Bahamas, pursuant to four export licenses issued by the Department of Commerce. These shipments were made pursuant to agreements between Bart Chamberlain, principal officer and principal stockholder of Gathering and Citmoco, and Edward M. Carey, principal officer and/or director of Carey Energy Corporation which owned New England Petroleum Corporation ("NEPCO"). It affirmatively appears that PETCO, to which company the petroleum was originally shipped from the United States, is a wholly owned subsidiary of NEPCO, the final recipient of the oil in question. The oil was refined by Bahamas Oil Refiners Co. ("BARCO") which is partially owned by PETCO. The first three contracts involved a sale of approximately 765,000 barrels at $14.00 per barrel; a fourth sale was of approximately 200,000 barrels at $13.00 per barrel. In order to effectuate the sale to PETCO, appellants were required to obtain export licenses from the Department of Commerce, and did so upon the showing that the proposed exportation of crude oil would not "affect the total quantity or quality of petroleum available to domestic users...." 15 C.F.R. § 377.6(b)(1); 38 Fed.Reg. 34442, 34443 (Dec. 13, 1973). The Federal Energy Office participated in the review and approval of the application for the export licenses, and officials of the Federal Energy Office were fully informed as to the details of the transactions.

Spawned by newspaper articles appearing in the summer of 1975, an initial investigation was had into the possible involvement of the Governor of New York resulting in a grand jury determination, with ultimate acknowledgement by the Department of Justice, that there was no credible evidence to support any allegations against that individual. A Congressional investigation also concluded that there was no substance to the allegations against the Governor of New York. In January, 1976, the Federal Energy Agency ("FEA") instituted another investigation involving, primarily, the enforcement of certain subpoenas, and during

that litigation, in November of 1978, defendant filed a second allowed counterclaim under the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 n. § 209[1] ("ESA") on behalf of the alleged overcharge of the domestic customers of NEPCO.

On cross motions for summary judgment, the district court granted partial judgment for the United States. *Citronelle-Mobile Gathering, Inc. v. O'Leary*, 499 F.Supp. 871 (S.D.Ala.1980). From this judgment appellants pursue an interlocutory appeal presenting four issues for decision at this level.

The case and all incidental issues revolve around the central question of whether the export exemption applies. If the sales are to be treated as exports, and/or domestic sales for export crude petroleum subject to the export licenses regulations of the Department of Commerce ("DOC"), then such are expressly excluded from FEA's petroleum allocation regulations; 10 C.F.R. § 211.-1. Prices charged for export sales, including sales to a domestic purchaser which certifies the product is for export, are also exempt from FEA's petroleum pricing regulations; 10 C.F.R. § 212.53. The question of whether the export exemption applies suggests the conclusion that if appellants are allowed to take advantage of what appeared to be a loophole in the law, then the whole concept of consumer protection, as found in the Department of Energy's ("DOE") regulations, may be frustrated. We consider in this light.

## THE SALES OF AMERICAN CRUDE OIL BY AN AMERICAN FIRM TO THE WHOLLY OWNED SUBSIDIARY OF ANOTHER AMERICAN FIRM WERE NOT "EXPORT SALES"

Appellants have urged this Court to consider the "plain" or "commonly accepted" meaning of the term "export sale". This Court cannot concentrate on individual words and ignore a consideration of the context in which the term appears. In order to determine the precise meaning of the term "export sale" it is imperative that strong consideration be given to the entire transaction giving rise to the "export sale"[2], coupled with a consideration of the purpose for which this regulation was intended.[3]

As stated earlier, appellant firms, both American corporations, sold crude oil produced in the United States to PETCO, a wholly-owned foreign subsidiary of another American corporation (NEPCO). Once refined, the same quantity of refined products was returned, not only to the United States, but to the *refiner's parent corporation* in the United States. This transaction, admittedly clever, is not original. In 1883, the Attorney General issued an opinion evolving from circumstances in which whiskey was to be shipped from the United States to Bermuda with the intent that it be returned to the United States after it had been aged. That opinion, holding there was no exportation, was later quoted with approval by the Supreme Court. *See Swan & Finch v. United States*, 190 U.S. 143, 145, 23 S.Ct. 702, 703, 47 L.Ed. 984 *quoting* 17 Op.A.G. 579, 583 (1883). The Court stated:

> [T]he legal notion ... of exportation is a severance of goods from the mass of things belonging to this country with the intention of uniting them to the mass of things belonging to some foreign country.

*Id.* at 145, 23 S.Ct. at 703. *See also United States v. 200 Watches*, 66 F.Supp. 228, 230, (S.D.N.Y.1946). In the case at bar, appellant's intention was that the refined products attributable to the Chamberlain firm's crude oil be returned to the United States. There was never any intention that the crude oil be joined with the mass of things in the Bahamas.

---

1. In addition to ... injunctive relief the court may also order restitution of moneys received in violation of any ... order or regulation.

2. *E.g., Tenneco Oil Co. v. FEA*, 613 F.2d 298, 303 (TECA 1979).

3. *E.g., United States v. Weber*, 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979).

The apparent plan of appellant's transactions becomes much clearer when considered along with the purpose and actual requirements of the pertinent regulations. Exports, and domestic sales for export, of crude petroleum subject to export license regulations of the Department of Commerce were, and are, excluded from FEA's petroleum allocation regulations. Prices charged for these "export sales", are exempt from the FEA's petroleum pricing regulations. (10 C.F.R. § 212.53 provides: The prices charged for export sales including sales to a domestic purchaser which certifies the product is for export, are exempt.) In order to take advantage of this exemption one must follow the simple, rudimentary procedure of obtaining an export license. This involves a showing that the "total quantity or quality of petroleum available to the United States" would not be diminished. 15 C.F.R. § 377.6(b)(1). Once licensed, an exporter is free to charge whatever price the foreign market can bear. Thus, the regulations were promulgated in such a way as to, among other things, increase foreign revenue, stabilize the economy, and assure sufficient quantities of petroleum. However, when the economic reality of the transactions is examined, it is quite obvious, as the able trial judge perceived, that these transactions had precisely the effect which Congress sought to avoid in enacting the Emergency Petroleum Allocation Act of 1973 (EPAA), to wit; higher oil prices to American buyers. *Citronelle, supra* at 883.

Finally, the case of *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199; 89 S.Ct. 361, 21 L.Ed.2d 344 (1968), is instructive and somewhat analogous. *Concentrated Phosphate* involved foreign aid paid for by the United States, specifically sales of phosphate to the Republic of Korea financed by the Agency for International Development. The Court faced the question of whether the associations made the sales "in the course of export trade" within the meaning of the Webb-Pomerene exemption, 15 U.S.C. §§ 61 *et seq.*, to the Sherman Act. The exemption allows the formation of joint associations in order to compete with foreign cartels in export trade. In making its decision the Supreme Court examined the purpose of the act in light of transactions occurring in attempts to take advantage of the Act. It is important to note that there is great similarity in the purpose of the DOE's "export sales" exemption and that of the Webb-Pomerene Act. In the DOE exemption, price controls were implemented to, "benefit United States consumers and the domestic economy." FEA Ruling 1975–7, 40 Fed.Reg. 30037 (July 17, 1975). Likewise, in dealing with the Webb-Pomerene Act, the Court, in *Concentrated Phosphate*, noted:

> It is clear what Congress was doing; it thought it could increase American exports by depriving foreigners of the benefits of competition among American firms, without in any significant way injuring American consumers. Cf. *United States Alkali Export Assn. v. United States*, 325 U.S. 196, 211, 65 S.Ct. 1120, 1128, 89 L.Ed. 1554 (1945). The validity of this economic judgment is not for us to question, but it is quite relevant in interpreting the language Congress chose. The question before us is whether Congress meant its exemption to insulate transactions initiated, controlled, and financed by the American Government, just because a foreign government is the nominal "purchaser." We think it did not.

*Id* at 208, 65 S.Ct. at 1127. As a result of this analysis the Court held:

> [T]he framers of the Webb-Pomerene Act did not intend that Americans should be deprived of the main benefits of competition among American firms. Since in all relevant aspects the transactions involved here were American, not Korean, we hold that they are not "export trade" within the meaning of the Webb-Pomerene Act.

*Id* at 209–10, 65 S.Ct. at 1127–28.

We conclude and so hold, that the trial judge was correct in his conclusion that these transactions were not "export sales" within the meaning of the EPAA. Appellant's transactions involved a mere hint of foreign participation, were designed so as to

take advantage of the established regulations and were completely repugnant to Congress' intent.

## APPLICATION OF ALABAMA'S ONE–YEAR STATUTE OF LIMITATIONS WOULD FRUSTRATE EFFECTIVE ENFORCEMENT OF THE ESA, EPAA AND RELATED STATUTES

■ This Court is faced with the question of whether Alabama's one-year statute of limitations [4] should be applied. If this statute were applied, the Government's claim for restitution would be altogether barred.

■ We find there is no specific federal statute of limitations applicable to § 209 actions; there are various guidelines available which enable this Court to determine whether the Alabama statute applies. Specifically, the Supreme Court

> has not mechanically applied a state statute of limitations simply because a limitations period is absent from the federal statute. State legislatures do not devise their limitations periods with national interests in mind, and it is the duty of the federal courts to assure that the importation of state laws will not frustrate or interfere with the implementation of national policies. "Although state law is our primary guide in this area, it is not, to be sure, our exclusive guide." *Johnson v. Railway Express Agency*, 421 U.S. 454, 456, 95 S.Ct. 1716, 1718, 44 L.Ed.2d 295 (1974). State limitations periods will not be borrowed if their application would be inconsistent with the underlying policies of the federal statute.

*Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 367, 97 S.Ct. 2447, 2454, 53 L.Ed.2d 402 (1977). It is also clear that state statutes of limitations must not be applied if such application would "frustrate or interfere with the implementation of national policies." *Id.* at 370–71, 97 S.Ct. at 2456–57.

■ The primary underlying policy of the ESA is to insure effective enforcement of the pricing regulations, on a national scale. *See Bulzan v. Atlantic Richfield Co.,*

620 F.2d 278 (TECA 1980). As an aide to such enforcement the DOE has the right to seek restitution in ESA enforcement actions. In fact, restitution is "appropriate and necessary to enforce compliance." *Univ. of Southern California v. Cost of Living Council*, 472 F.2d 1065, 1070 (TECA 1972). The right to enforce compliance to such restitution of price overcharges is equitable, *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), and suits to enforce equitable rights created by federal law are not subject to state statutes of limitations, even if brought by a private party. *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946).

Additionally, we must consider the overall effect of borrowing state statutes of limitations in cases such as the one at bar. Effective nationwide enforcement of the ESA must not be hampered by the various periods of limitations throughout the fifty states. Certainty as to the length of the limitation period will only facilitate the implementation of this national policy. Thus, we affirm the trial judge's decision to refuse the application of Alabama's one-year statute of limitations.

## RESTITUTION IS APPROPRIATE RELIEF

■ Having agreed with the district court's determination that appellants have violated the provisions of the ESA, EPAA and the regulations promulgated thereunder which establish the ceiling price for the four sales of domestic crude oil, and the maximum lawful selling price for the resale of domestic crude oil, 6 C.F.R. part 150 and 10 C.F.R. part 212, this Court reviews the relief fashioned by the district court judge. The counterclaim seeks judgment requiring plaintiffs to pay into an escrow account, "for subsequent distribution to NEPCO customers", the excess charges. Allegations place the sum between $6,000,000.00 and $9,000,000.00, exclusive of interest and civil penalties. No accurate calculations are before the Court at this time. This Court

---

4. That statute provides a one-year limitation on "[a]ctions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section . . . ."

concurs in the district court's conclusion [499 F.Supp. at 885] that good faith, as opposed to willfulness, characterized plaintiff's dealings with the Department of Commerce.

An immediate confrontation with the method/process of enforcement emerges. Neither appellants, nor various *amici* attack restitution as being outside the scope of relief authorized, rather, they insist the decision ordering restitution to the United States Treasury is beyond the district court's authority. The Court finds on this issue no justification for allowing plaintiffs to retain their illegal gains.

The district court, sitting as a Court of Equity, unless otherwise provided by statutes here in contemplation, had "all the inherent equitable powers of the District Court ... available for the proper and complete exercise of that jurisdiction"; *Porter, supra* 328 U.S. at 398, 66 S.Ct. at 1089, and has power, "to do equity and mould each decree to the necessities of the particular case"; further, "It may act so as to adjust and reconcile competing claims ... so as to accord full justice to all the real parties in interest ...." The authority inherent in the equity powers guarantees complete rather than truncated justice. *Camp v. Boyd*, 229 U.S. 530, 551, 33 S.Ct. 785, 793, 57 L.Ed. 1317 (1913). The power of a district court to require restitution, as was pronounced in *United States v. Lieb*, 333 F.Supp. 424 (W.D.Tex.1971), was specifically endorsed and ratified by Public Law 92–210 [5] (Sec. 209), but nothing has been pronounced as to payment to the United States Treasury. Federal district courts unquestionably possess broad discretion in fashioning equitable remedies, *Franks v. Bowman Transportation, Co.*, 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1975) but, as contemplated in the exercise of these powers to remedy civil wrongs and restore civil rights, the authority is vested to make the victims whole, "so far as possible, and restored to a position where they would have been had it not been for" the unlawful violation, such as was practiced here. It follows that payment to the United States Treasury is not restitution, in the true sense of the word, or in the objectives of the statutes here involved.

■ We face the brilliant rationale of the trial court in its envision of millions of customers along the east coast having been overcharged. Clear, however, is the fact that the sale of the over-priced oil was made to determinable utilities and other institutions along the Atlantic seaboard. Faced with a statute that specifically authorizes restitution, but makes no provision for direct payment to the treasury, we turn to *University of Southern California, supra*, which ordered refunds of excess charges for football tickets.

> While this Court recognizes the considerable burden that such a refund demand places ... we recognize also the right of the agencies to require it.

*Id.* at 1070.

We believe such a process to be a reasonable application of the power of the district court. This is obviously in the contemplation of defendant as evidenced by its request for relief. Actions by the United States under ESA § 209 are taken to enforce public, not private, rights. Thus, compensation is "a by-product of the agency's effort to re-establish compliance with its regulatory scheme." *Bulzan, supra* at 282. The central purpose of restitution is to determine the amount by which the wrongdoer has been unjustly enriched, and then to make him disgorge that amount. No proof is required that the plaintiff was damaged, much less the amount of any damage:

> Restitution is generally awarded only in order to deprive the defendant of enrichment obtained at the plaintiff's expense ... the general requirement does not mean that the gain to the defendant need be equated to the loss of the plaintiff, nor indeed that there need be any loss to the plaintiff except in the sense that a legally protected interest has been invaded.

5. *See* U.S. Code and Congressional News, 92d Congress, 1st Session (1971) pp. 2283, 2291.

*Restatement of Restitution,* Sec. 1, Comment e (1937), cited in *Sauder v. Doe,* 648 F.2d 1341 (TECA 1981). The district court properly held that because NEPCO and PETCO aided and abetted the Chamberlain firms in their violation of the price regulations, for their material benefit, they are barred by "unclean hands" from seeking or recovering any of the illegal profits.

Apparently, however, restitution payments may be made to the Treasury under special order of the court. The Treasury holds the payments in a "Deposit Fund Account" to be paid out at the direction of DOE. *See* General Accounting Office Procedures Manual, Title 7, Sec. 4.10(6). *Cf. Hodgson v. Wheaton Glass Co.,* 446 F.2d 527, 535 (3d Cir. 1971).[6] Receipts contained in those accounts are subject to a "constructive trust," *Emery v. United States,* 186 F.2d 900, 902 (9th Cir. 1951); are treated as liabilities of the United States, *see e.g.,* Treasury Combined Statement of Receipts, Expenditures, and Balances of the United States Government, Fiscal Year 1978 at 3,12; and for their disbursement, an appropriation is not required. This affords an opportunity for DOE to pursue those proposals suggested by its request that the Court

> Enter a judgment requiring Gathering, Services and Chamberlain to pay into an escrow account for subsequent distribution to NEPCO customers, a sum of . . .

As determined by the district court the Government has demonstrated injury to a class of persons. Whether the defendant will ask to amend under Rule 15, Federal Rules of Civil Procedure, institute interpleader under Rule 22 and related statutes, or proceed otherwise is not revealed in the record before this Court. Suffice it to note that the Government has a *duty* to try to ascertain those overcharged, and refund them, with interest, from the restitution funds.

The Order of the district court is modified and the case remanded to that forum

for an Order directing the application to the General Accounting Office Procedures, and/or the furnishing of a plan for the "Deposit Fund Account", and/or other appropriate procedures, to be approved by the district court.

Meanwhile, within such time as the district court may direct, the parties will enter a stipulation, failing which, file appropriate motions in that forum.

## THERE IS NO FACTUAL BASIS FOR RECUSAL BY THE DISTRICT JUDGE

The grounds for recusal in this case were based entirely upon the unsupported assertion, of a United States' Attorney's unverified opinion, made at a social gathering. Regardless of whether it was a statement of the Attorney's opinion,[7] the motion failed to meet the requirements of 28 U.S.C. § 455 and of 28 U.S.C. § 144. The motion was entirely without integrity, in addition to being untimely.

The issue was not urged by appellants. We find no justification for lengthy discussion. The findings of the district court are adopted as the findings of this Court.

The judgment of the district court is affirmed except as modified by the opinion of this Court, and this case is remanded to the district court for further proceedings in keeping with this opinion.

AFFIRMED AS MODIFIED.

POINTER, Judge, concurring in part, dissenting in part:

### A. *Disqualification.*

I agree that there was no error in denying appellants' motion for disqualification under 28 U.S.C. § 455(a). I do not, however, find fault in the timing of the motion. Rather, I believe the motion—premised upon gratuitous speculation by opposing counsel as to possible bias of the judge,

---

**6.** *See also* 28 U.S.C. §§ 2041, 2042.

**7.** The attorney later recanted and stated he had no reason to believe the judge acted improperly

or was biased, acknowledging the statements were "totally baseless and unfair."

comments which the attorney later acknowledged to have been "totally baseless and unfair"—lacks a sufficiently colorable factual basis for any reasonable question to have been raised concerning the judge's impartiality.

## B. *Limitations Period.*

I also concur in the conclusion that the government's claim for restitution was not barred by Alabama's one-year statute of limitation. As was true with the back pay claims presented by the government in *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 97 S.Ct. 2447, 58 L.Ed.2d 402 (1977), such a limitations period would frustrate the implementation of national policies involved in the pricing regulations here in issue. The Supreme Court recognized in *Occidental* that in some circumstances a defense of laches might be appropriate; but the appellants have not here even argued that the trial judge was in error in finding that the defense of laches had not been established.

## C. *Applicability of Price Controls.*

I must respectfully dissent, however, from the affirmance of the ruling that the sales to PETCO in 1974 were not "export sales" exempt from domestic price controls. While the imposition of price controls on these transactions might now appear to have been appropriate as a matter of policy, the regulations in place at the time the sales were contemplated and consummated did not limit the prices that PETCO might be charged, a conclusion which government officials had consistently, if begrudgingly, acknowledged prior to filing of the amended counterclaim in the present litigation in 1978.

The essential facts of the proposed transactions, including the price to be charged PETCO and the importation of a like quality of refined products into the United States, were shown in the applications for export licenses reviewed by the Petroleum Products Exception Committee, which included representatives from the FEO. As the prices exceeded permissible domestic levels, the Department of Commerce contacted FEO's General Counsel, who offered no objection to the proposed transactions and advised that there appeared to be no legal basis for denying the applications. The export licenses were granted, and there has been no suggestion in this litigation that those licenses were other than valid and proper.

The transactions were later scrutinized by attorneys from a United States Attorney's office, from the Department of Justice, and from the FEA. In terminating that investigation, it was the opinion of each attorney that "if petroleum was exported pursuant to a valid export license, ... the FEA price regulations did not apply to that sale."

Similarly, in an attachment to a letter to a Congressional committee investigating the transactions, the Administrator of the FEA wrote:

> Crude oil can be exported only pursuant to a valid export license. The FEA regulations have always provided that crude oil (or any refined product) sold for export is exempt from both FEA allocation and pricing regulations. 10 C.F.R. §§ 211.1(b)(1), 212.53(a). Therefore, assuming there is no other factor bearing on the issue, the sale of crude oil by a U.S. producer to a foreign refiner for export pursuant to a validly issued export license is exempt from U.S. price controls and can occur at whatever price the parties agree upon.

The interpretation of a regulatory system by those charged with its enforcement should be given great deference by the judiciary, *e.g., Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), particularly with respect to a contemporaneous construction by those charged with setting the machinery of a new program in motion, *Chemehuevi Tribe of Indians v. Federal Power Comm'n*, 420 U.S. 395, 409–10, 95 S.Ct. 1066, 1075, 43 L.Ed.2d 279 (1975). See also *Andrus v. Shell Oil Co.*, 446 U.S. 657, 667–68, 100 S.Ct. 1932, 1938–39, 64 L.Ed.2d 593 (1980). This principle is not vitiated by the fact that the government agency may have at some later time in new interpretations or in the course of litigation attempted to advocate a

change of its views. See *General Electric Co. v. Gilbert*, 429 U.S. 125, 141–45, 97 S.Ct. 401, 410–12, 50 L.Ed.2d 343 (1976); *Norwegian Nitrogen Produces Co. v. United States*, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933). Nor, inasmuch as these particular transactions were scrutinized by the affected agencies and found to constitute exempt "export sales", do I find persuasive the appellees' efforts to cite as if applicable the interpretation of the regulations given in factually distinguishable situations. *Cf. Tesoro Petroleum Corp.* Interpretation No. 78–10, Enforcement Manual (CCH) ¶ 56,400 (March 24, 1978) (equal volume exchange); FEA Interpretation 1977–16, 42 Fed.Reg. 31151 (June 20, 1977) (sale to instrumentality of United States for its consumption abroad).

The construction of the regulatory system by the administrative agency prior to the current litigation was, moreover, consonant with—if not mandated by—the language of the regulations, however adequately or inadequately those regulations may have considered the effect of a tri-partite arrangement such as here involved. It can hardly be doubted that the sales by the appellants to PETCO—sales of crude oil produced by a domestic company in the United States to an unrelated foreign company located in the Bahamas, for refining at Bahamian facilities—would in ordinary usage be considered an "export sale," the words of 10 C.F.R. § 212.53(a). This would be so even though a like quantity of refined products was destined by prearrangement for shipment into the United States—as an "import" free from price controls, to use the words of 10 C.F.R. § 212.53(b)—to a third company which the trial court found, under rulings not challenged in this interlocutory

appeal, to be independent from and not an alter ego of the Bahamian company.

To be sure, words like "export sale" or "export trade" are not immune from consideration in the light of recognized principles of statutory and regulatory construction. See, *e.g., United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968).[1] I find unpersuasive, however, appellees' attempt to disavow its earlier interpretation that these sales to PETCO were "export sales" exempted from price controls, while continuing to acknowledge that they were "exports" exempted from the allocation regulations by 10 C.F.R. § 211.1(b)(1). It is unnecessary to consider the extent to which total congruency between the allocation and price regulations should be required; it is sufficient to note that an inconsistent interpretation such as appellees suggest should hardly be favored. As this Court has said, "Congress was conferring authority . . . to regulate only the price of that which it was mandating the President to allocate." *Shell Oil Co. v. FEA*, 527 F.2d 1243, 1246 (TECA 1975). One can hardly reconcile the present ruling, treating the transactions for purposes of price controls as if PETCO were a domestic refiner, with the earlier decision of the agency that for purposes of the allocation regulations "it is . . . not appropriate that [PETCO's refinery] which is located in a foreign country be treated as if it were located in the United States." See *New England Petroleum Corp.*, 2 FEA ¶ 83,136 at 83,429 (May 2, 1975), *aff'd*, 2 FEA ¶ 80,468 (August 7, 1975), *modified, New England Petroleum Corp. v. FEA*, 455 F.Supp. 1280 (S.D.N.Y.1978).

Nor is there merit in the argument that a distinction in treatment of the same trans-

---

1. In *Concentrated Phosphate*, sales of phosphate to the Republic of Korea in which an agency of the United States government "selected the commodity, determined the amount to be purchased, controlled the contracting process, and paid the bill," 393 U.S. at 208, 89 S.Ct. at 366, were held not to be exempt from the anti-trust laws under the Webb-Pomerene Act. The Supreme Court, viewing the transactions as ones in which "the United States was, in essence, furnishing fertilizer to Korea," con-

cluded that "it stretches neither the language nor the purpose of the Act" to hold that the imputed sales to the United States were subject to the anti-trust laws. *Id.* Unlike the case *sub judice*, the court was not in that decision adopting a construction which would be at variance with interpretations adopted by the agency charged with enforcement of the law or in conflict with the other portions of the regulatory system.

action under the allocation and price regulations can be justified on the basis that the exemption in the former is for "exports" while that in the latter is for "export sales." The difference is merely stylistic, as demonstrated by the fact that the same subsection of the pricing regulations also exempts sales to a domestic producer certified to be "for export", 10 C.F.R. § 212.53(a), and the next subsection of the regulations provides an exemption for "imports", 10 C.F.R. § 212.53(b). Indeed, as appellants note, the purported distinction based upon joinder of the words "export" and "sales" in § 212.-53(a) would presumably mean that appellants' sales to PETCO were subject to price controls while PETCO's sales to NEPCO were not—with the bizarre result that, while NEPCO and its domestic customers would have remained subject to the higher prices, the so-called improper profits could have been made by a foreign company such as PETCO but not by domestic companies such as the appellants.

Those writing the regulations have, moreover, shown that they know how to provide special treatment, if that is desired, where there are interrelated transactions. See, e.g., 10 C.F.R. § 212.82 (definition of "Exchange" in price regulations for refiners), § 212.92 (definition of "Matching purchase and sale" in price regulations for resellers and retailers). Indeed, after the transactions now in question had occurred, the regulations concerning export licenses were amended to provide, inter alia, for the consideration of the potential effect upon domestic prices prior to issuance of the license. See 15 C.F.R. § 377.6(d)(1).

### D. Propriety of Restitution.

While the sales to PETCO were not, in my view, subject to price controls under the regulations as promulgated and construed by the enforcement agency, the majority's treatment of the issues concerning a remedy is more disturbing.

The trial court held that the amounts charged PETCO in excess of domestic price levels, estimated at $6,000,000 to $9,000,000, should be paid by the appellant sellers to the United States. The payment is not to be made as a civil penalty or fine; indeed, the trial court absolved the appellants from liability for the relatively modest civil sanctions imposed under 12 U.S.C. § 1904 n. § 208 for violation of the regulations. Rather, the award was described as one of "restitution" under § 209 of the Act, and was ordered paid into the treasury of the United States "because it cannot flow to the wronged individuals and because permitting the retention of the illegal overcharges would utterly frustrate the purposes of the EPAA." The court reached this conclusion after having decided that (1) restitution should not be made to PETCO, the company charged the excessive price by appellants, because of "unclean hands"; (2) restitution should not be made to NEPCO, which purchased from PETCO the refined products, for a like reason; (3) restitution should not be made to most of NEPCO's customers because they passed on the overcharges to their customers; and (4) restitution could not, as a practical matter, be fairly apportioned among the vast number of consumers who ultimately bore the damage of higher prices. In a succinct statement of the rationale, the trial judge noted:

> "Realistically this holding very simply means that, since the people are sovereign, and where large numbers, here millions, have been injured, the peoples' institution, the United States government, will recover the disgorged wrongful profits."

The majority of the opinion of this court concludes, quite correctly in my view, that payment to the treasury of the United States "is not restitution in the true sense of the word or in the objectives of the statutes here involved." Restitution is a remedy in which restoration of the parties to their prior positions is sought to be effected by measuring relief on the basis of the improper benefits to the wrongdoer rather than on the basis of the damages to the injured party; it does not change traditional concepts as to the identity of the persons committing the wrong or sustaining the injury.

Nonetheless, the opinion apparently still leaves standing, under some vaguely defined notion of general equitable principles, the proposition that restitution should be paid to the government, to be held as if a constructive trust subject to directions of DOE. According to the instructions on remand, the government would have a "duty to try to ascertain those overcharged, and refund them, with interest, from the restitution funds;" it is left open for the district court to determine the extent, if any, to which the court would be involved in the implementation of a plan for distributing the amounts paid to the treasury. Any amounts not allocated and distributed to those found to have been overcharged—a task which the trial court has already found to be impracticable—would presumably escheat for all practical purposes to the government.

The approach of the majority, while lacking the simplicity and directness of that adopted in the district court, suffers in my opinion from the same fatal flaw—prescribing a judicial remedy for violation of the regulations which is beyond that authorized in the Congressional enactment or the administrative regulations.[2] In place of the remedy constructed by the district court, which in essence intermingles the provisions of the Act relating to civil penalties with those relating to restitution, the panel has substituted a remedy which in essence melds the concept of a parens patriae action with that of a fluid recovery. In my opin-

ion neither approach is warranted by applicable law and precedents[3] and each would have a far-reaching, untoward jurisprudential consequences.

If, as the district court held, restitution should not or can not be paid to those who purchased the products at an illegally high price—and if it is appropriate that this issue be considered by this court on this appeal—then I would hold that restitution should not be ordered, even if the result would be the retention of illegal gains.

I do not believe, however, that the question of restitution should be addressed on this interlocutory appeal under 28 U.S.C. § 1292(b). There has been no cross-appeal by the government under § 1292(b), and there is no final judgment in the district court from which appeals might be taken on all issues which bear upon the proper relief, if any, to be granted on proof of statutory violations. Whether, for example, the appellants should have been absolved from liability for any civil penalty is not presently before this court. Nor are the many rulings of the district court—such as the impracticability of determining those who were wronged by the alleged overcharge, the barring of PETCO and NEPCO from any award on the basis of "unclean hands", and the barring from any award those which passed overcharges through to their customers[4]—which may well affect the

---

**2.** While not mentioned in the opinion of the district court or that of the majority, it may be noted that in 1979 the regulations were amended to provide special procedures for refunds *administratively* found due to injured persons where either the identity of the persons or the amount of the refunds could not readily be ascertained. 10 C.F.R. § 205.280 *et seq.*, 44 Fed.Reg. 8566. These regulations permit the rejection of claims too small to warrant individual consideration, § 205.286(b), and the payment of undistributed funds to the treasury or in any other manner approved by the OHA, § 205.287(c).

**3.** While there have been cases providing for payment of funds into the treasury for distribution to those injured by statutory violations— such as *Hodgson v. Wheaton Glass Co.*, 446

F.2d 527 (3rd Cir. 1971); *Hansen v. United States*, 340 F.2d 142 (8th Cir. 1965); *Emery v. United States*, 186 F.2d 900 (9th Cir. 1951)— these have been situations where the identity of the payees and the amounts to be paid them had been resolved in the judicial proceedings brought by the government. Perhaps the case most nearly offering support for the panel's approach is the unappealed district court decision in *Oakland Raiders v. Office of Emergency Preparedness*, 380 F.Supp. 187 (N.D.Cal.1974), directing that the balance of overcharges on football tickets that could not be paid to the persons overcharged be disgorged through reduction in the price of future ticket sales.

**4.** But see *Eastern Airlines, Inc. v. Atlantic Richfield Co.*, 609 F.2d 497 (TECA 1979).

propriety of an award of restitution. I would therefore hold that the question of restitution should not be considered on this appeal and would vacate the permission previously given for interlocutory appeal of this issue as having been improvidently granted.