RJG CAB, INC., Individually and on behalf of all others similarly situated and Geraldine H. Sweeney, Individually and on behalf of all others similarly situated and Philadelphia Electric Company, On behalf of itself and all others similarly situated, Intervenor, Appellants,

v.

Donald HODEL, Individually and as Secretary of Energy of the United States and Rayburn Hanzlik, Individually and as Administrator of the Economic Regulatory Administration of the Department of Energy of the United States, Appellees.

No. 85–1573.

United States Court of Appeals,
Third Circuit.

Argued April 17, 1986.

Assigned May 22, 1986.

Decided July 23, 1986.
Rehearing Denied Aug. 28, 1986.

---

* Honorable Robert C. Zampano, District Judge, United States District Court for the District of Connecticut, sitting by designation.

Philip P. Kalodner (argued), Philadelphia, Pa., for RJG Cab, Inc., and Geraldine H. Sweeney.

Harold E. Kohn, Joseph C. Kohn, Kohn, Savett, Marion & Graf, Philadelphia, Pa., for Philadelphia Elec. Co.

Alexander Ewing, Jr., Asst. U.S. Atty., Philadelphia, Pa., Elisa B. Vela (argued), U.S. Dept. of Justice, Civil Div., Washington, D.C., for U.S.

Before SEITZ, HIGGINBOTHAM and BECKER, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

The plaintiffs, RJG Cab, Inc. (RJG), and Geraldine H. Sweeney (Sweeney), and the plaintiff-intervenor, Philadelphia Electric Co. (PECO) [hereinafter collectively "plaintiffs"], appeal a final order of the the the district court dismissing for lack of standing and ripeness their challenge to the constitutionality of section 155 of the Further Continuing Appropriations Act of 1983, Pub. L. No. 97–377, 96 Stat. 1830, 1919–20 (1982) (the Warner Amendment or section 155). The government contends that this appeal should be dismissed for lack of subject matter jurisdiction because section 211(b)(2) of the Economic Stabilization Act, 12 U.S.C. § 1904 *note*, vests exclusive jurisdiction over it in the Temporary Emergency Court of Appeals (TECA).

### I.

The plaintiffs were consumers of gasoline and other petroleum products during the period of federal regulation of the prices of such products from 1973 through 1981.[1] The Warner Amendment directed disposition of some $200 million from a Department of Energy (DOE) escrow fund that contained sums received in settlement of DOE investigations of price control regulations. Under the Warner Amendment, the funds were to be disbursed into five designated state energy programs.

The plaintiffs alleged in the district court that, as victims of overcharges on gasoline and other price-regulated products, they were entitled to benefit either directly or indirectly from the escrowed funds, and

---

1. RJG and Sweeney sought certification as class representatives of commercial (RJG) and non-commercial (Sweeney) users of gasoline and other petroleum products in motor vehicles during the period of regulation. PECO sought certification as class representative of investor-owned utilities that purchased oil or petroleum products during that period. The district court did not rule on the plaintiffs' motions for class certification in light of its holding that they lacked standing to bring the action on their own behalf.

would have so benefited but for the enactment of the Warner Amendment. Because the Warner Amendment allegedly funneled off the $200 million impermissibly for the benefit of the "poor," its enactment, they claim, deprived them of property without due process of law or compensation, and violated the doctrine of separation of powers by usurping the functions of the executive (DOE) and judicial branches to whom had been committed the disbursal of the funds. Before describing further the procedural history of this action, it may be helpful to describe the statutory scheme for remedying violations of the oil pricing regulations, and the impact of the Warner Amendment thereon.

### A.

The Emergency Petroleum Allocation Act of 1973 (EPAA), Pub. L. No. 93–159, 87 Stat. 628 (1973), *codified as amended at* 15 U.S.C. §§ 751–760h, was enacted in response to the energy crisis of the early 1970's. It empowered the President to regulate the allocation and pricing of various petroleum products produced in or imported into the United States. *See* 15 U.S.C. § 753. The President's authority under the EPAA has been administered by a succession of federal agencies, of which the DOE is the most recent. 42 U.S.C. § 7151(a). "[T]he purpose of petroleum price regulation was to ensure fair allocation of petroleum resources at equitable prices and to encourage the search for new energy resources." *United States v. Exxon Corp.*, 773 F.2d 1240, 1248 (Temp.Emer.Ct.App. 1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 892, 893, 88 L.Ed.2d 926 (1986). For a more detailed description of the history of the EPAA, see *Exxon Corp. v. United States Dep't of Energy*, 744 F.2d 98, 106 (Temp.Emer.Ct.App.), *cert. denied*, —— U.S. ——, 105 S.Ct. 576, 83 L.Ed.2d 515 (1984).

We need not describe the regulatory scheme in detail. However, like other regulatory schemes, the EPAA and its accompanying regulations have enforcement mechanisms. First, DOE may enforce its regulations by issuing remedial orders. A remedial order may be proposed by the Economic Regulatory Administration (ERA) of DOE after suitable investigation has shown that a probable violation of DOE regulations has occurred. There is a process for contesting and appealing the issuance of remedial orders which advances through various stages, including hearings before DOE's Office of Hearings and Appeals (OHA) and appeals to the Federal Energy Regulatory Commission (FERC). *See generally* 10 C.F.R. §§ 205.190–205.-1991. Remedial orders may require rollbacks in prices, refunds of overcharges, and "such other action as DOE determines is necessary to eliminate or compensate for the effects of a violation." 10 C.F.R. § 205.1991.

As noted, DOE has discretion to implement a wide range of remedies from payment to first purchasers, *Midwest Petroleum Co. v. Department of Energy*, 760 F.2d 287 (Temp.Emer.Ct.App.1985), to direct payments into the United States Treasury. *Payne 22, Inc. v. United States*, 762 F.2d 91 (Temp.Emer.Ct.App.1985). In addition, DOE may petition OHA to implement "special refund procedures" under Subpart V of the DOE regulations, 10 C.F.R. §§ 205.280–205.288. When such a petition is received, OHA must issue an order providing for custody of the funds at issue, either in an escrow account or in some other way. 10 C.F.R. § 205.287(a).

The special refund procedures provide a mechanism for making refunds to persons injured by violations of DOE regulations in "situations in which the Department of Energy is unable to readily identify persons who are entitled to refunds specified [in remedial or consent orders] or to readily ascertain the amounts that such persons are entitled to receive." 10 C.F.R. § 205.-280. Persons who feel they are entitled to restitution as victims of the violations apply for a refund, and OHA evaluates, and grants or denies, the applications. OHA need not consider applications for refund amounts that are too small to justify the administrative costs involved in processing

them, 10 C.F.R. § 205.286(b), and "any remaining funds remitted pursuant to the Remedial Order or Consent Order shall be deposited in the United States Treasury or distributed in any other manner specified in the decision and order." 10 C.F.R. § 205.-287(c). Indeed, where there are a great number of injured small purchasers, particularly consumers, payment into the Treasury of the whole amount provided for in the consent order has been considered "appropriate ... since 'the payment to the U.S. Treasury works to the benefit of *all* consumers and purchasers.'" *Payne 22, Inc.*, 762 F.2d at 92, quoting DOE Notice of Adoption of Proposed Consent Order, 45 Fed.Reg. 80348 (1980) (emphasis in original).

DOE is not restricted to seeking enforcement administratively. The EPAA incorporates the enforcement mechanisms set forth in the Economic Stabilization Act of 1970 (ESA), 12 U.S.C. § 1904 *note. See* 15 U.S.C. § 754(a)(1). The ESA provides for both public (section 209) and private (section 210) enforcement actions against violators of DOE regulations promulgated pursuant to the EPAA.

Section 209 empowers the DOE to bring actions in a United States district court to enjoin acts or practices in violation of DOE regulations, and to order restitution of any "moneys received in violation of any such order or regulation." ESA, section 209. Section 210 allows direct purchasers injured by overcharges to recover trebled damages for such violations. ESA, section 210. *See Gulf Oil Corp. v. Dyke,* 734 F.2d 797 (Temp.Emer.Ct.App.), *cert. denied,* —— U.S. ——, 105 S.Ct. 173, 83 L.Ed.2d 108 (1984).

Like the remedies obtained administratively, section 209 remedies have run the gamut from identification of and payment of restitution to injured purchasers, *see Citronelle-Mobile Gathering, Inc. v. Edwards,* 669 F.2d 717 (Temp.Emer.Ct.App.), *cert. denied,* 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982) (payment of escrowed funds into U.S. Treasury inappropriate where injured purchasers readily identifia-

ble), to funneling payments to the states for use in enumerated energy programs "designed to benefit the consuming public." *United States v. Exxon Corp.,* 773 F.2d at 1286 (no need for district court "to attempt the impossible task of attempting to ascertain the damage sustained by individual consumers of petroleum products;" the programs enumerated by the district court were the very ones designated by the Warner Amendment).

### B. The Warner Amendment

In 1982, Congress enacted the Warner Amendment. That amendment "authorized the Secretary of Energy to disburse, as soon as practicable, up to $200,000,000 derived from settlements of alleged petroleum pricing and allocation violations which were held in trust accounts administered by the Department on December 17, 1982." Notice of Distribution of $200,000,000 in Escrowed Funds to States, District, Territories and Possessions (Notice), 48 Fed. Reg. 5293, 5294 (Feb. 4, 1983). The funds were to be disbursed "for limited restitutional purposes (1) which are reasonably expected to benefit the class of persons injured by such violations, and (2) which, based on information previously provided to Congress by the Secretary of Energy, are likely not to be, through procedures established by regulation, otherwise refunded to injured persons because the purchasers of refined petroleum products cannot be reasonably identified or paid or because the amount of each purchaser's overcharge is too small to be capable of reasonable determination." Section 155(a) of the Warner Amendment.

The Warner Amendment directed that the funds be disbursed to the states in proportion to their consumption of refined petroleum products. The states, in turn, could employ the funds only to supplement funds otherwise provided by the federal government for use in five designated energy conservation programs. Although the plaintiffs persistently characterize those programs as "aid to the poor," they actually represent a diverse group of measures aimed at promoting conservation and

deemed by Congress as to benefit all injured classes. The programs provided funds for weatherization of homes, state energy conservation plans, conservation programs at schools and hospitals, conservation programs for small businesses and individual energy consumers, and heating and/or cooling cost assistance for low income households.

The Warner Amendment was designed to leave within the funds sufficient money to pay identifiable victims of overcharges through the Subpart V process. It directed the disbursal only of those funds for which it could be determined there would be no successful claimants and which were received pursuant to consent or remedial orders not "inconsistent with the statutory disbursement." Notice, 48 Fed.Reg. at 5294. DOE has subsequently petitioned OHA to institute Subpart V proceedings to distribute $112 million of the $117 million that remained in the escrowed funds after the $200 million disbursal mandated by the Warner Amendment. *See* 48 Fed.Reg. 49336 (1983).

### C.

The plaintiffs brought this action challenging the constitutionality of the Warner Amendment, and seeking a return of the $200 million to the U.S. Treasury and a subsequent disbursal of the entire fund through Subpart V proceedings. They claimed, essentially, that they had a right to benefit from the funds held in escrow, either directly through refunds or indirectly through distribution of the funds in such a way as to benefit proportionately each class of victims of overcharges.[2] Claiming to represent over 40% of the victimized petroleum users, they allege that they would have received a proportionate benefit from the escrowed funds because the Subpart V proceedings would have required DOE, as trustee of the funds, to structure distribution of the funds to benefit the entire consuming population. They

would have received this benefit, that is, but for the enactment of the Warner Amendment, which, they allege, siphoned off $200 million to benefit the poor.

Thus, the argument concludes, the Warner Amendment is unconstitutional first because it deprives the plaintiffs of their expectancy without either just compensation or due process and constitutes an unconstitutional taking of their property; and, second, because Congress' action in directing the disbursal of the funds usurps the functions of the DOE and judiciary and violates the constitutional scheme of separation of powers.

The district court did not reach the merits of the plaintiffs' constitutional claims. The court noted first that direct purchasers cannot challenge consent orders because ESA section 210 gives them a statutory right of action to recover overcharges. *See Midwest Petroleum Co. v. U.S. Dep't of Energy*, 760 F.2d 287 (Temp.Emer.Ct.App. 1985). Further, the purpose for the administrative remedies provided for in DOE regulations is to insure the enforcement of those regulations and not to compensate victimized direct or indirect purchasers; thus, DOE is enforcing public not private rights in seeking remedial and consent orders. *See Bulzan v. Atlantic Richfield Co.*, 620 F.2d 278 (Temp.Emer.Ct.App. 1980). The court held, therefore, that DOE does not have a mandatory duty to make restitution to the overcharged parties with such funds; any moneys received through issuance of remedial or consent orders are therefore simply "a by-product of the agency's effort to reestablish compliance with its regulatory scheme." *Bulzan*, 620 F.2d at 282.

Thus, the district court concluded that the plaintiffs lacked standing to challenge the constitutionality of the Warner Amendment. It reasoned that the plaintiffs had failed to show that they had an outright entitlement to proportionate compensation for the overcharges under the ESA and/or

---

**2.** In their complaint, plaintiffs claimed a vested property right in the escrowed funds. While they have not abandoned that claim entirely, they assert now that, at least, they had a reasonable expectancy of a proportionate benefit from the whole of the funds.

DOE regulations. Such a showing, it held, was a prerequisite to establishing injury in fact sufficient to confer standing. In addition, the court determined that the plaintiffs were not within the class of persons that section 209 and the DOE regulations were designed to protect.

The district court also held that, even assuming the plaintiffs did have standing to challenge the Warner Amendment, their claims were not ripe for adjudication. Because the consent orders do not constitute findings or admissions that there were overcharges, the plaintiffs could not show that they were indeed victims of overcharges until such time as their applications for Subpart V refunds were granted, the identification of such victims being committed to OHA. The court held that the plaintiffs' claims would not ripen until, if ever, OHA determined that they were due refunds and that there were insufficient funds remaining in the escrow account to compensate them fully in the Subpart V proceedings.

## II.

Because the court determined that that plaintiffs lacked standing and that their claims were not ripe, it granted DOE's motion for a judgment on the pleadings and denied the plaintiffs' motion for summary judgment. The plaintiffs appealed both to this court and to TECA, and moved successfully to stay proceedings in TECA pending our resolution of this appeal. The possibility of dual appeals arises from the peculiar grant of appellate jurisdiction contained in section 211(b)(2) of the ESA, incorporated into the EPAA by 15 U.S.C. § 754(a)(1). *See Coastal States Mktg. Inc. v. New England Petroleum Corp.*, 604 F.2d 179 (2d Cir.1979); *see also Atlantic Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d 771, 778 n. 40 (D.C.Cir.1984); *United States v. Wyatt*, 680 F.2d 1080, 1085 n. 7 (5th Cir.1982). Because section 211 determines whether this court has subject matter jurisdiction over appeals concerning

EPAA issues, we must examine the issues before us in light of its jurisdictional grant before we can address plaintiffs' arguments that they do indeed have standing and that their claims are ripe.

### A.

Section 211(b)(2) provides that:

the Temporary Emergency Court of Appeals shall have exclusive jurisdiction of all appeals from the district court of the United States in cases and controversies arising under this title or under regulations or orders issued thereunder.

ESA, § 211(b)(2), *reprinted in* 12 U.S.C. § 1904 *note*.

In *Coastal States*, the Second Circuit discussed at length the differing meanings that could be assigned to the phrase "cases and controversies arising under this title or under regulations or orders issues thereunder." The court examined the legislative history and available precedent and noted Congress' concerns that there be "speed and consistency of decisions in cases arising under the Act." *Coastal States*, 604 F.2d at 184, *quoting* S.Rep. No. 92–507, 92d Cong., 1st Sess. 10, *reprinted in* 1971 U.S. Code Cong. & Admin. News 2283, 2292. *See also Bray v. United States*, 423 U.S. 73, 74, 96 S.Ct. 307, 309, 46 L.Ed.2d 215 (1975). The court held that "some form of 'issue' jurisdiction is a sound interpretation of § 211(b)(2)." *Coastal States*, 604 F.2d at 186.

In considering the "contours" of issue jurisdiction, the court rejected the idea of TECA jurisdiction over judgments in cases where an ESA issue was merely raised, either in the complaint or as a defense, but where the judgment rested on a non-ESA issue.[3] "What is determinative ... is not the existence of an ESA issue, but whether an ESA issue has been adjudicated. We therefore conclude that 'cases and controversies arising under' the ESA, as used in § 211(b)(2), means adjudications by a dis-

---

3. Because of the incorporation of the ESA scheme of jurisdiction into the EPAA, ESA issues for jurisdictional purposes include EPAA issues and issues involving regulations promulgated pursuant to either statute. *See Coastal States*, 604 F.2d at 182 n. 2.

trict court of an 'ESA issue.' " *Coastal States*, 604 F.2d at 187.

All other courts of appeals, including TECA itself, that have faced such a problem have agreed. *See, e.g., Atlantic Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d 771 (D.C.Cir.1984); *United States v. Wyatt*, 680 F.2d 1080 (5th Cir.1982); *Texaco, Inc. v. Department of Energy*, 616 F.2d 1193 (Temp.Emer.Ct.App.1979); *see also Mountain Fuel Supply Co. v. Johnson*, 586 F.2d 1375 (10th Cir.1978), *cert. denied*, 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1058 (1979). This system of "issue jurisdiction" leads inevitably to the filing of "protective appeals in both TECA and the court of appeals for the appropriate circuit," *Atlantic Richfield*, 769 F.2d at 778 n. 40, *citing Coastal States*, 604 F.2d at 186 n. 9, and the possibility of dual appellate review, *Texaco*, 616 F.2d at 1197, or "bifurcated appeals from unitary judgments," *Wyatt*, 680 F.2d at 1085 n. 7, *citing Coastal States*, 604 F.2d at 185.

■ Despite the apparent awkwardness of this method of determining jurisdiction, *see Texaco*, 616 F.2d at 1199 (Hoffman, J., dissenting; "We must wonder as to the wisdom and necessity of creating a special court such as TECA. Approximately thirty percent of TECA's cases are decided upon jurisdictional grounds"); *Sector Ref., Inc. v. Enterprise Ref. Co.*, 771 F.2d 496, 502 (Temp.Emer.Ct.App.1985) (expressing "fear [that] this construction ... is overly narrow and results in wasteful volleying of cases between the TECA and the courts of appeal"), it best meets Congress' concern that there be consistency of decisions interpreting the labyrinthine structure of the EPAA and its regulations, and we hereby adopt the *Coastal States* interpretation of section 211 of the ESA.

It has become clear since *Coastal States* that in deciding whether TECA or a circuit court has jurisdiction, the reviewing court must "conduct a jurisdictional inquiry into each claim raised ... on appeal." *Wyatt*,

680 F.2d at 1085 n. 7. "[W]e look only to the nature of the issue on appeal and not to the nature of the underlying case or controversy." *Gulf Oil Corp. v. U.S. Dep't of Energy*, 639 F.2d 766, 767 (Temp.Emer.Ct. App.1981). "[A]n EPAA issue [is] one involving the construction, applicability and effect of the EPAA." *Scallop Corp. v. Tully*, 705 F.2d 645, 647 (2d Cir.1983) (citations omitted).

Plaintiffs urge that the issue of the constitutionality of the Warner Amendment is not subject to TECA's jurisdictional grant, because that issue does not involve the interpretation of any of the statutes or regulations the interpretation of which at the appellate level is committed to TECA. As the preceding discussion shows, however, whether the ultimate issues are within TECA's jurisdiction is wholly irrelevant, since the district court never reached those issues and they are not before us at this time.[4] *See Texaco*, 616 F.2d at 1198 ("the sole concern of this appeal is the [basis of] the lower court's holding"). The *Coastal States* rule requires that we dissect the issues actually before us to see whether the decision in the district court involved the adjudication of an EPAA issue.

**B.**

The district court held that the plaintiffs did not show either that they had suffered an injury-in-fact, or that they and/or their complaint are within the zone of interests that the EPAA and its accompanying regulatory scheme were designed to protect. *See Valley Forge Christian College v. Americans United for the Separation of Church and State*, 454 U.S. 464, 471–76, 102 S.Ct. 752, 757–61, 70 L.Ed.2d 700 (1982). It would have been more precise had the district court concluded that plaintiffs and/or their complaint were not within the zone of interests entitled to fifth amendment protection. So-called EPAA protection was not the issue. Nevertheless, it is evident that its holdings necessar-

4. We need not and do not decide at this time whether jurisdiction over an appeal on the merits of the underlying controversy in this case,

i.e., the constitutionality of the Warner Amendment, could be properly entertained in this court.

ily involved the construction, applicability or effect of the EPAA and implementing regulations and orders.

In order to decide whether the plaintiffs had suffered a cognizable injury from the Warner Amendment's alleged diversion of the escrowed funds, the district court was confronted, of necessity, with the question whether the plaintiffs had any legal interest in the funds themselves, or in the manner of their distribution. "[T]he plaintiff generally must assert his own legal rights and interests.... Although standing in no way depends upon the merits of the plaintiffs' contention that particular conduct is illegal ..., it often turns on the nature and source of the claim asserted. The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Warth v. Seldin,* 422 U.S. 490, 499–500, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975), *quoting Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148 n. 3, 35 L.Ed.2d 536 (1973).

■ Whether plaintiffs claim injury to a vested right or an expectancy of a proportional benefit,[5] it is plain that the very existence of those legal interests in this case hinges on an interpretation of the EPAA, its accompanying regulations, "or orders issued thereunder." ESA § 211(b)(2). We therefore hold that this court lacks subject matter jurisdiction over the issue of whether plaintiffs have standing to challenge the constitutionality of the Warner Amendment, and that jurisdiction over the appeal of that issue lies in TECA.

### C.

The district court held that even assuming that the plaintiffs had standing to challenge the constitutionality of the Warner Amendment, their claims were not ripe for adjudication because plaintiffs cannot claim to be victims of overcharges until they are so determined by OHA. Thus, the court ruled that the plaintiffs' claims would not be ripe until such time as their applications for special refunds were granted by OHA and the OHA determined that there were insufficient funds remaining to pay them. While it is not self-evident from this holding that an EPAA issue was adjudicated in the district court, we believe that jurisdiction over the appeal of this issue also lies in TECA.

In reaching its conclusions, the district court necessarily rejected plaintiffs' argument that they were entitled to a proportional benefit from the entire escrow fund, and that their injury was, therefore, suffered at the very time that the $200 million was disbursed pursuant to the Warner Amendment. This argument is founded on the same theory of entitlement upon which the plaintiffs based their argument that they had standing, and the district court thus adjudicated an EPAA issue in rejecting it. If the plaintiffs do indeed have such an entitlement, then their claim that the Warner Amendment infringed on their expected benefit would have been ripe, at the latest, at the time of the disbursal of the $200 million.

In the final analysis, the determination whether plaintiffs' claims were ripe or not turned on the adjudication of an EPAA issue. We conclude, therefore, that this court lacks subject matter jurisdiction over the appeal of this issue also, and that jurisdiction lies properly in TECA.

### D.

Plaintiffs argue that the issues before us are among "those subsidiary, procedural or threshold questions—such as mootness, standing, and ripeness—that are incidental to questions that are within our jurisdiction," *MGPC, Inc. v. Department of Energy,* 673 F.2d 1277, 1281 (Temp.Emer.Ct. App.1982), and that we therefore have jurisdiction to consider them if we have jurisdiction over the underlying issues.

■ We do not believe that the rule of issue jurisdiction can be so easily evaded.

---

5. We, of course, intimate no opinion on whether such rights or expectations actually exist, or whether the kind of intrusion on such rights alleged here constitutes a cognizable injury.

We agree with TECA that, when issues of standing or ripeness are indeed subsidiary or incidental, the *MGPC* rule is sensible and not precluded by section 211's jurisdictional grant. However, where, as here, the only issues before us are standing and ripeness, and the review of those issues hinges primarily on the interpretation of the EPAA and the whole DOE scheme of oil price regulation, jurisdiction over that review lies in TECA. *C.f. Department of Energy v. Brimmer*, 776 F.2d 1554, 1556–57 (Temp.Emer.Ct.App.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1261, 89 L.Ed.2d 571 (1986) (Supreme Court's decision in *Bray v. United States*, 423 U.S. 73, 96 S.Ct. 307, 46 L.Ed.2d 215 (1975), that contempt charge related to subpoena in ESA case was not an ESA issue, "apparently did not contemplate that the decision to enforce the subpoena might itself involve the adjudication of an ESA issue").

Our conclusion is reinforced by the fact that the issue whether the plaintiffs have any legal interest in the escrowed funds flowing from DOE consent and remedial orders capable of being injured by the Warner Amendment is closely related to a number of issues on which TECA has already ruled. *See, e.g., Exxon*, 773 F.2d at 1282–83 (trial court need not require refunds to injured consumers from restitution fund established in § 209 action); *Payne*, 762 F.2d at 93–94 (persons entitled to bring § 210 action may not intervene in DOE enforcement action, and may therefore not challenge consent order providing that restitution be paid into U.S. Treasury to benefit the public); *Midwest Petroleum*, 760 F.2d at 289–90 (third parties lack standing to challenge DOE consent order's substantive provisions); *Bulzan*, 620 F.2d at 281–83 (administrative remedies not designed to provide redress for a victim of violations of DOE regulations, therefore participation in Subpart V proceedings does not bar § 210 action). For us to assert jurisdiction over such issues would frustrate Congress' intent to route EPAA issues to TECA in order to gain consistency of decision.

III.

We therefore conclude that this court lacks subject matter jurisdiction over the standing and ripeness issues embraced in this appeal from the district court. Accordingly, we will dismiss this appeal.