**SHEPHERD OIL, INCORPORATED,**
Plaintiff-Counter-Defendant-Appellant,

v.

**ATLANTIC RICHFIELD COMPANY,**
Defendant-Counter-Claimant-Appellee.

No. 9–69.

Temporary Emergency Court of Appeals.

Argued Dec. 29, 1983.

Decided April 16, 1984.

William H. Bode, Batzell, Nunn & Bode, Washington, D.C., with whom John E. Varnum, Washington, D.C., of the same firm, was on brief for plaintiff-counter-defendant-appellant.

Joseph A. Ball, Ball, Hunt, Hart, Brown & Baerwitz, Beverly Hills, Cal., with whom James Polish and Russell C. Swartz, Beverly Hills, Cal., of the same firm, and Keith M. Clemens, Los Angeles, Cal., were on brief for defendant-counter-claimant-appellee.

David A. Ross and Melvin A. Schwarz, Dechert, Price & Rhoads, New York City, on brief for amicus curiae, Getty Refining and Marketing Co.

Thomas C. Newkirk, Thomas H. Kemp and Dennis M. Moore, Office of Gen. Counsel, Dept. of Energy, Washington, D.C., on brief for amicus curiae, Dept. of Energy.

Before CHRISTENSEN, HOFFMAN * and PECK, Judges.

JOHN W. PECK, Judge.

Shepherd Oil, Inc. (Shepherd Oil) appeals from an order of the United States District Court for the Central District of California that (1) denied Shepherd Oil summary judgment on its claim for declaratory relief with respect to alleged overcharges arising from its purchase of crude oil in August and September 1979 from Atlantic Richfield Company (ARCO) under a contract negotiated pursuant to the Mandatory Crude Oil Allocation Program (Buy/Sell Program), 10 C.F.R. § 211.65, and (2) granted ARCO summary judgment on its counterclaim for breach of contract arising from Shepherd Oil's failure to pay for oil delivered.[1] The principal issues raised by Shepherd Oil involve the propriety of ARCO's exclusion from its calculation of the maximum allowable price for crude oil sold under the Buy/Sell Program of three types of crude oil: (1) imported crude oil received by ARCO in exchange for domestic crude oil; (2) crude oil imported by ARCO but delivered directly to a refiner-buyer under the Buy/Sell Program; and (3) foreign crude oil held by ARCO in storage in oil tankers offshore the United States due to a lack of onshore storage or pipeline capacity. An additional issue is whether state or federal rules of prejudgment interest are to be applied in the event of an award of damages on ARCO's breach of contract claim.

## I. THE DISPUTE

The dispute arose out of a contract for the sale of low sulfur crude oil by ARCO to Shepherd Oil pursuant to the Buy/Sell Program. The contract established the maximum price allowed by the Buy/Sell Program as the sale price of the crude oil.

The Buy/Sell Program, as in effect during the time at issue, was designed primarily to guarantee access to supplies of crude oil to those small refiner-buyers, such as Shepherd Oil, that lacked access to adequate supplies of domestic and foreign crude oil.[2] See, e.g., 44 Fed.Reg. 3418,

---

* Judge Hoffman filed an opinion, attached hereto, concurring in part and dissenting in part.

1. This decision is rendered upon rehearing. See Section III, infra. The late Honorable Robert W. Hemphill was a member of the original panel that heard this case. After suffering a heart attack, Judge Hemphill requested to be relieved from further services in this case. The Chief Judge of the Temporary Emergency Court of Appeals announced in an order filed December 1, 1983 the designation of Judge Christensen to replace Judge Hemphill in the case.

2. 10 C.F.R. § 211.62 provides the following definitions that are relevant to this case:

"Refiner-buyer" means any small refiner which is determined to be eligible for an allocation of crude oil pursuant to § 211.65 of this subpart.

"Small refiner" means a refiner, the sum of the capacity of the refineries of which (including the capacity of any person who controls, or is under common control with such refiner) does not exceed 175,000 barrels per day.

"Refiner-seller" means a refiner which is not a small refiner or independent refiner as defined

3419 (Jan. 16, 1979); 42 Fed.Reg. 42770, 42773 (Aug. 24, 1977). Under the Buy/Sell Program, the Department of Energy (DOE), following a review of applications of eligible small refiner-buyers, published a buy/sell notice specifying the sale obligations of refiner-sellers and the purchase entitlements of eligible small refiner-buyers. 10 C.F.R. § 211.65(g). Subject to various limitations as to time and price, the refiner-sellers and refiner-buyers were to negotiate the terms of the purchase of the crude oil sold under the Buy/Sell Program. 10 C.F.R. § 211.65(g) & (j).

The limitation as to price, which is the limitation pivotal to resolution of this case, is contained in the Buy/Sell Price Rule, 10 C.F.R. § 212.94, as amended by Special Rule No. 2. The Buy/Sell Price Rule provided, in part, that the price of low sulfur crude oil sold under the Buy/Sell Program could "not exceed the refiner-seller's weighted average per barrel landed cost ... of all low sulfur ... imported crude oil ... delivered to the refiner-seller in the month in which the sale is made, plus a handling fee of five cents per barrel, and any transportation, gravity and sulfur content adjustments ...." 10 C.F.R. § 212.-94, as amended by Special Rule No. 2. In effect, the Buy/Sell Price Rule limited the sale price of low sulfur crude oil sold under the Buy/Sell Program in a particular month to the refiner-seller's average cost of imported low sulfur crude oil for that month, subject to various adjustments. The basic dispute concerns the proper method for determination of the maximum price that can be charged under the Buy/Sell Price Rule. In calculating its average cost of imported low sulfur crude oil

for August and September 1979, ARCO excluded the cost of three types of oil: (1) imported crude oil received by ARCO in exchange for domestic crude oil; (2) crude oil imported by ARCO but delivered directly to a refiner-buyer under the Buy/Sell Program, rather than to an ARCO refinery; and (3) foreign crude oil held offshore by ARCO in tankers due to onshore storage and pipeline unavailability. Because the average per barrel cost of these three types of oil was lower than the figures that ARCO determined to be its weighted average per barrel landed cost for August and September 1979, inclusion of the excluded oil would have resulted in a lower sale price to Shepherd Oil.

Each of the three types of crude oil excluded generated a separate dispute. The exchange issue arose as a result of the disparity between the price of domestic oil, which was comparatively low due to the domestic two-tier pricing program,[3] and the price of foreign oil on the world market. In exchanging domestic oil for foreign oil, ARCO's customary accounting practice was to value the higher priced imported crude oil at the lower cost of the domestic crude oil given up. Because this accounting practice resulted in the assignment of an artificially low value to the imported crude oil, ARCO did not want to include the imported oil in its weighted average per barrel landed cost calculations and thereby distort the actual cost of its crude oil. If ARCO had included the assigned value of the imported crude oil in its calculations of its weighted average per barrel landed cost, that figure would have been artificially low and, in effect, such refiner-buyers as

in this section: *Provided,* That a refiner which is not a small refiner or an independent refiner, and all of the refining capacity of which has been constructed after January 1, 1974, shall not be classified as a refiner-seller; and *provided further,* That for the allocation period commencing October 1, 1977, the refiners considered to be refiner-sellers for purposes of § 211.65 of this subpart shall include only those firms classified as refiner-sellers in the allocation quarter commencing June 1, 1977. Refiner-seller shall also mean the United States Government when SPR crude oil is allocated pursuant to § 211.65 of this subpart; *except*

*that,* unless expressly provided, the provisions of § 211.65(e)–(j) shall not apply to the United States Government.

3. Under the two-tier system in effect from February 1976 until January 28, 1981 (the date of crude oil decontrol), low ceiling prices were established for first sales of "lower tier" or "old" oil and substantially higher ceiling prices (but still well below the prices prevailing on the world market) were established for the first sales of "upper tier" or "new" oil.

Shepherd Oil would receive a windfall. ARCO's exclusion of the assigned value of the imported crude oil, however, resulted in the exclusion of some imported crude oil delivered to ARCO from ARCO's Buy/Sell Price Rule calculations in violation of what that rule appears on its face to require.

The interpretation of the Buy/Sell Price Rule is also pivotal to the dispute involving imported crude oil sold to refiner-buyers under the Buy/Sell Program. ARCO contends that imported crude oil delivered directly to a refiner-buyer under the Buy/Sell Program neither is delivered to ARCO for purposes of the Buy/Sell Price Rule nor incurs a landed cost in ARCO's possession. Shepherd Oil responds that the plain meaning of the terms of the Buy/Sell Price Rule requires a refiner-seller, such as ARCO, to include all imported crude oil, including crude oil sold directly to a refiner-buyer under the Buy/Sell Program, in its Buy/Sell Price Rule calculations. Because the cost of the foreign crude oil sold and delivered to refiner-buyers under the Buy/Sell Program was lower than the cost of the imported crude oil included by ARCO in its Buy/Sell Rule calculations, the exclusion resulted in a higher price being charged to refiner-buyers than if the cost of the imported crude oil had been included.

The final dispute, which concerns ARCO's exclusion of the cost of imported crude oil stored offshore in oil tankers due to an unavailability of onshore storage and pipeline capacity until the oil is unloaded, turns largely on when imported crude oil incurs a landed cost so that it must be included in a refiner-seller's Buy/Sell Price Rule calculations. ARCO contends that under the Buy/Sell Price Rule it may properly adhere to its customary accounting practice of treating imported crude oil as incurring a landed cost only upon unloading. Shepherd Oil responds that the regulations make clear that once imported oil has been delivered it incurs a landed cost. As in the case of the imported crude oil sold directly to refiner-buyers under the Buy/Sell Program, exclusion of the crude

oil stored offshore from the Buy/Sell Price Rule calculations resulted in a higher price being charged refiner-buyers under the Buy/Sell Program. The result in both cases was caused not by the disparity in price between price-controlled domestic oil and foreign oil, but rather by the happenstance that the cost of the imported oil excluded from the calculations was lower than that of the imported oil included.

## II. FACTS

The parties have stipulated the salient facts. On March 30, 1979, the DOE published a buy/sell notice establishing the sale obligations of refiner-sellers and the purchase entitlements of eligible refiner-buyers for the allocation period from April 1979 through September 1979. This notice listed Shepherd Oil as an eligible refiner-buyer and ARCO as a refiner-seller.

On May 1, 1979, Shepherd Oil and ARCO entered into a written agreement whereby, pursuant to the Buy/Sell Program, ARCO agreed to sell and deliver to Shepherd Oil approximately 481,839 barrels of low sulfur domestic crude oil. The agreement provided that delivery would be at the rate of approximately 3,150 barrels per day during the period from May 1, 1979 through September 30, 1979. The agreement also provided that on the first day of a month following a month in which deliveries were made, Shepherd Oil would remit to ARCO payment for the crude oil delivered at a projected price of $18.50 per barrel. As part of the agreement, Shepherd Oil further agreed to remit to ARCO the amount of any adjustment necessary to make Shepherd Oil's payment equal to the sale price authorized by the Buy/Sell Price Rule. Subsequent to the date of the sale agreement, the parties agreed to revise the projected price of the crude oil delivered in September 1979 upward from $18.50 per barrel to $25.00 per barrel.

ARCO delivered approximately 97,650 and 94,380 barrels of low sulfur crude oil to Shepherd Oil in August and September

1979, respectively.[4] On August 31, 1979, Shepherd Oil paid ARCO $1,806,525 for the August 1979 deliveries based on the projected price of $18.50 per barrel. On September 6, 1979, ARCO sent Shepherd Oil an invoice charging an additional $606,-747.11 as an adjustment to reflect the $24.1123 per barrel price ARCO determined to be authorized by the Buy/Sell Price Rule. Subsequently, Shepherd Oil remitted this amount to ARCO. On October 1, 1979, Shepherd Oil paid ARCO $2,362,500 for the September 1979 deliveries of crude oil based on the projected price of $25.00 per barrel.

By a "Provisional Invoice Subject to Revision" dated October 4, 1979, ARCO rebilled Shepherd Oil for the August 1979 deliveries of crude oil at a revised rate of $29.9228 per barrel resulting in an additional adjustment of $564,812.97. By a "Provisional Invoice Subject to Revision" dated October 8, 1979, ARCO billed Shepherd Oil for the September 1979 deliveries at a rate of $29.9228 per barrel for an initial adjustment of $516,073.53. By a "Provisional Invoice Subject to Revision" dated October 29, 1979, ARCO rebilled Shepherd Oil for the October 1979 deliveries at a revised rate of $31.0234 per barrel for an additional adjustment of $106,716.17. Shepherd Oil declined to remit any payment to ARCO for these three adjustments.[5]

In determining the maximum price authorized by the Buy/Sell Price Rule for a month, ARCO included the costs of imported crude oil unloaded in the United States during that month if the crude oil was to be processed at one of ARCO's four domestic refineries. ARCO did not include the costs of imported oil in the calculation of the weighted average per barrel landed cost of

imported crude oil in three circumstances. First, ARCO treated imported crude oil received in exchange for ARCO's domestic crude oil as retaining the characteristics of domestic oil. As a consequence, ARCO excluded from its calculation of the maximum price authorized by the Buy/Sell Price Rule the cost of imported oil received in exchange for ARCO's domestic oil as well as the cost of imported oil received in exchange for imported oil that in turn had been exchanged for domestic oil by ARCO.[6] Second, ARCO did not include in the Buy/Sell Price Rule calculations the costs of imported crude oil sold under the Buy/Sell Program and delivered directly to a refiner-buyer instead of being delivered to an ARCO domestic refinery. Third, if a vessel was able to discharge only a portion of its cargo of foreign crude oil within the calendar month of arrival at a United States port due to limited onshore storage or pipeline capacity, ARCO did not treat the unloaded portion as delivered until it was unloaded from the vessel. As a consequence, the price of such imported oil was not included in the Buy/Sell Price Rule calculations until the month in which it was unloaded. In its final calculation of the maximum price authorized by the Buy/Sell Price Rule for deliveries to Shepherd Oil in August 1979, ARCO excluded six lots of imported crude oil that it had obtained in exchange for its domestic oil. Additionally, ARCO excluded one lot of foreign oil that had been delivered directly to a refiner-buyer, other than Shepherd Oil, under the Buy/Sell Program. The following table summarizes the transactions excluded from the Buy/Sell Price Rule calculations for August 1979:

---

**4.** With respect to sales of crude oil by ARCO to Shepherd Oil under the contract for the months of May, June and July 1979, Shepherd Oil paid the initial amount due as well as any adjustments charged by ARCO in subsequent invoices.

**5.** Subsequent to initiation of this action, ARCO notified Shepherd Oil that ARCO had made three inadvertent errors in its Buy/Sell Price Rule calculations involving adjustments for the gravity content of the crude oil sold and for an

improper transportation charge. Correction of the errors resulted in a net credit of $13,625.23 to Shepherd Oil.

**6.** For the purposes of this opinion, imported oil received in exchange for imported oil that in turn had been received in exchange for domestic oil is identified as imported oil received in exchange for domestic oil.

Table 1 August 1979

A. Imported Oil Obtained in Exchange for Domestic Oil

| Cargo Description (barrels) | | Cargo Cost ($) | ARCO's Per Barrel Cost ($) |
|---|---|---|---|
| 23,716 | Algerian Blend | 281,342 | 11.863 |
| 51,901 | Algerian Blend | 1,128,324 | 21.7399 |
| 393,042 | Zarzaitaine | 8,544,701 | 21.7399 |
| 193,145.6 | Algerian Blend | 4,198,977 | 21.7400 |
| 235,804 | Algerian Blend | 5,126,366 | 21.7399 |
| 363,355 | Kole | 4,833,556 | 13.3026 |

B. Imported Oil Delivered Directly to Refiner-Buyer

| Cargo Description (barrels) | | Cargo Cost ($) | ARCO's Per Barrel Cost ($) |
|---|---|---|---|
| 156,425.38 | Ardjuna | 3,328,701 | 21.2798 |

In its final calculation of the maximum price authorized by the Buy/Sell Price Rule for deliveries to Shepherd Oil in September 1979, ARCO excluded five lots of imported crude oil that it had obtained in exchange for its domestic oil. ARCO additionally excluded one lot of imported crude oil delivered directly to a refiner-buyer, other than Shepherd Oil, under the Buy/Sell Program. This lot had been obtained in exchange for domestic crude oil owned by ARCO. Finally, ARCO excluded three lots of foreign crude oil held onboard a tanker offshore one of its refineries due to a lack of onshore storage and pipeline capacity. ARCO included the three lots in its Buy/Sell Price Rule calculations for deliveries made in October 1979 under the Buy/Sell Program. The following table summarizes the transactions excluded from the Buy/Sell Price Rule calculations for September 1979:

Table 2 September 1979

A. Imported Oil Obtained in Exchange for Domestic Oil

| Cargo Description (barrels) | | Cargo Cost ($) | ARCO's Per Barrel Cost ($) |
|---|---|---|---|
| 148,654 | Zarzaitaine | 2,846,606 | 19.1492 |
| 193,470 | Algerian Blend | 3,704,774 | 19.1491 |
| 173,156 | Nigerian Light | 3,333,123 | 19.2492 |
| 379,636 | Algerian Blend | 7,269,716 | 19.1492 |
| 336,720 | Algerian Blend | 6,447,915 | 19.1492 |

B. Imported Oil Delivered Directly to Refiner-Buyer [7]

| Cargo Description (barrels) | | Cargo Cost ($) | ARCO's Per Barrel Cost ($) |
|---|---|---|---|
| 225,213.99 | Sirtica | 4,312,645 | 19.1491 |

C. Foreign Oil Stored Offshore in Tankers

| Cargo Description (barrels) | | Cargo Cost ($) | ARCO's Per Barrel Cost ($) |
|---|---|---|---|
| 472,451 | Ardjuna | 11,014,774 | 23.3141 |
| 100,529 | Minas | 2,291,060 | 22.7900 |
| 139,055 | Cinta | 3,162,641 | 22.7438 |

7. This oil also should be categorized as imported oil obtained in exchange for domestic oil.

### III. THE PROCEEDINGS

On March 13, 1980, Shepherd Oil filed its complaint seeking a declaratory judgment that ARCO had charged prices for the crude oil delivered in August and in September 1979 in excess of that authorized by the Buy/Sell Price Rule. ARCO answered and filed counterclaims seeking damages for breach of contract and for goods sold and delivered. Following discovery, the parties stipulated the facts which are summarized above and filed cross-motions for partial summary judgment on the issue of the propriety of ARCO's exclusion from its calculation of the maximum price authorized by the Buy/Sell Price Rule the crude oil transactions summarized in the above tables. On September 2, 1981, the district court granted summary judgment for ARCO based on its holding that ARCO's exclusion of the three types of crude oil was in compliance with the Buy/Sell Price Rule. In May 1982, the parties agreed to dismissal of Shepherd Oil's remaining claims and the district court ordered the entry of final judgment for ARCO. Following an additional stipulation of facts, submission of briefs, and presentation of oral argument by counsel, the district court, in an order entered July 12, 1982, awarded ARCO pre-judgment interest at a rate of 14.2% simple interest per annum on the principal sum of the judgment.

Shepherd Oil filed a notice of appeal on August 9, 1982. The case was briefed and was originally argued on December 1, 1982. On May 4, 1983, a decision by a panel of the Temporary Emergency Court of Appeals was filed which vacated the judgment of the district court. On May 31, 1983, ARCO filed a petition for rehearing and a suggestion of appropriateness for rehearing en banc. On June 10, 1983, the panel issued an order withdrawing its opinion of May 4, 1983 and staying issuance of the mandate pending determination of ARCO's petition for rehearing. The June 10, 1983 order also invited the DOE to file a brief as *amicus curiae*, pursuant to which the DOE filed its brief on August 8, 1983. Rehearing was ordered on December 1, 1983 and additional oral argument was held on December 29, 1983.[8]

### IV. ANALYSIS

#### A. Exclusion of Imported Oil Received in Exchange for Domestic Oil

The relevant language of the Buy/Sell Price Rule provides that the cost of low sulfur crude oil sold under the Buy/Sell Program may "not exceed the refiner-seller's weighted *landed cost* (as defined in § 212.82, but utilizing the volumes of imported crude oil at the time of importation into the United States), ... of *all* low sulfur ... imported crude oil ... delivered to the refiner-seller in the month in which the sale is made", plus various adjustments. 10 C.F.R. § 212.94, as amended by Special Rule No. 2 (emphasis added). The dispute of the parties turns on the analysis to be afforded to two terms contained in the rule. One is "all", the other is "landed cost".

The Buy/Sell Price Rule on its face purports to apply to all deliveries of imported crude oil. The language of the rule does not on its face distinguish between deliveries of imported oil acquired by exchange for domestic oil and deliveries of imported oil acquired through purchase by cash or other consideration. Nevertheless, we decline to construe the Buy/Sell Price Rule as applying to all imported crude oil without consideration of the other elements of the rule.

■ While the first principle of regulatory construction may be that regulatory terms not given a specific regulatory definition are to be interpreted according to

---

8. Getty Refining & Marketing Co. was permitted to file an *amicus curiae* brief in support of ARCO's petition for rehearing and suggestion for rehearing en banc.

their commonly understood definitions, *Tenneco Oil Co. v. Federal Energy Administration*, 613 F.2d 298, 302 (Em.App. 1979), it is well-recognized that a court "cannot concentrate on individual terms and ignore a consideration of the context in which the term appears." *Citronelle-Mobile Gathering, Inc. v. Edwards*, 669 F.2d 717, 719 (Em.App.), *cert. denied*, 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982). We believe that full effect can be given all terms of the Buy/Sell Price Rule only if the rule is construed to require inclusion of that crude oil which is imported, is delivered, and has incurred a landed cost. With respect to the foreign crude oil received in exchange for ARCO's domestic crude oil, the only issue is whether it incurred a landed cost.

The term "landed cost" is defined with respect to crude oil in 10 C.F.R. § 212.82 as follows:

"Landed cost" means:

. . . .

(5) For purposes of crude oil purchased in an arms-length transaction or purchased in a transaction to which § 212.84(g) is applicable, the purchase price (or the cost if § 212.84(g) is applicable) plus the cost of transportation, if any, computed pursuant to § 212.85, from the point of delivery to the firm to the U.S. port of entry (or the actual cost of transportation to the U.S. border in the case of crude oil not transported by sea), plus the cost of domestic transportation to the refinery, plus import fees and duties incurred. For purposes of this paragraph (5), the landed cost shall be considered to be incurred when the cost is recognized as having been incurred by application of the refiner's customary accounting procedures generally accepted and consistently and historically applied.

Shepherd Oil contends that the language of this definition directs the assignment of a "landed cost" to imported crude oil received in exchange for domestic crude oil.

Shepherd Oil bases its contention on the definition's use of the term, "purchase", which, though not defined in 10 C.F.R. § 212.82, is asserted to denote exchanges as well as traditional sales arrangements. In support of its analysis of the term "purchase", Shepherd Oil relies on regulations in which exchanges are treated as purchases. First, Shepherd Oil cites 10 C.F.R. § 212.92, which is applicable to sales of regulated products other than crude oil and which expressly defines "purchase" to denote an acquisition by exchange. Second, Shepherd Oil cites 10 C.F.R. § 212.-83(c)(2)(iii)(C), which establishes a price rule applicable to the sales of refined products by resellers, in which crude oil obtained by exchange, as well as by purchase, is included expressly in the calculation of increased crude oil costs that can be passed on to purchasers. Third, Shepherd Oil cites 10 C.F.R. § 212.182, in which exchanges are included in the determination of crude oil acquisition costs in resales of crude oil. Finally, Shepherd Oil cites *Standard Oil Co. v. Federal Energy Administration*, 612 F.2d 1291, 1294 (Em.App.1979), in which the court treated an exchange as a purchase for the purpose of computing increased product costs under 10 C.F.R. § 212.83(b).

■ Shepherd Oil's argument is not persuasive. As an initial point, it is clear that exchanges are not uniformly treated as purchases throughout the price control and allocation regulations. Two of the regulations on which Shepherd Oil relies indicate that, for some purposes, exchanges are not purchases. 10 C.F.R. § 212.83(c)(2)(iii)(C) explicitly lists exchanges as distinct from purchases; 10 C.F.R. § 212.182, although not containing a definition of "purchase", expressly defines "sale" as not including an exchange for purposes of Subpart L, which governs the resale of crude oil. Moreover, the fact that the term "purchase" is defined to include acquisitions by exchange for some purposes in the overall structure of the allocation and price regulations does not indicate that acquisitions by

exchange are purchases for all purposes. In light of the explicit inclusion of exchanges in the definition of "purchase" in specific regulations, e.g., 10 C.F.R. § 212.-92, the absence of any indication in 10 C.F.R. § 212.82 that "purchase" denotes exchanges for purposes of determining the landed cost of crude oil should not be treated as inadvertent but rather as indicating that, for the purpose of assigning a landed cost, exchanges are not purchases.

In rejecting the interpretation of "landed cost" proffered by Shepherd Oil, we do not focus solely on the construction of the term "purchase". We hold, instead, that the terms of 10 C.F.R. § 212.82 direct the treatment of imported oil obtained in exchange for domestic oil as not incurring a landed cost.

By its terms, 10 C.F.R. § 212.82 provides that a landed cost is incurred when recognized as incurred by the refiner in the "application of the refiner's customary accounting principles generally accepted and consistently and historically applied." In exchanging domestic crude oil for foreign crude oil, ARCO's customary accounting practice was to value the higher priced foreign crude oil at the cost of the lower priced domestic crude oil given up. This accounting procedure was mandated by the regulatory accounting requirements of the Entitlements Program, 10 C.F.R. § 211.-

67(g)(1) & (2), which directed that volumes of domestic oil exchanged for foreign oil be deemed to be retained by the refiner.[9] Because the regulatory accounting requirements embodied in 10 C.F.R. § 211.67(g) directed ARCO to treat as retained the domestic oil exchanged away for foreign oil in its accounting procedures, ARCO received from an exchange no crude oil that could incur a landed cost. Accordingly, we conclude that the terms of 10 C.F.R. § 212.82, by incorporating through reference ARCO's regulatorily mandated accounting procedures, authorized ARCO's exclusion of the costs of the imported crude oil acquired in exchange for ARCO's domestic crude oil from its Buy/Sell Price Rule calculations.

This conclusion is consistent with the general policy underlying the Buy/Sell Program, which, as stated above, was to guarantee access to supplies of crude oil to those small refiner-buyers, such as Shepherd Oil, that lacked access to adequate supplies. See, e.g., 44 Fed.Reg. 3418, 3419 (Jan. 16, 1979); 42 Fed.Reg. 42770, 42773 (Aug. 23, 1977). It is, of course, true that the Buy/Sell Program also was concerned with the distribution of crude oil supplies at equitable prices to preserve the competitive viability of small refiners. 44 Fed.Reg. 26060, 26062 (May 4, 1979). Our holding

---

9. 10 C.F.R. § 211.67(g)(1) & (2) provided:

(g) *Exchanges of crude oil.* (1) Subject to the provisions of paragraph (g)(3) of this section, in any exchange of crude oil in which only quality and location differentials are given effect in the calculation of the exchange ratio, or in any matching purchase and sale transaction which has the same effect as such an exchange, no volumes of domestic crude oil shall be deemed to have been transferred. Any volumes of domestic crude oil exchanged away or sold pursuant to any such exchange or matching purchase and sale transaction shall be considered as having been retained by the refiner or other firm that has so exchanged away or sold such volumes, regardless of the volume of crude oil received or purchased by that refiner or other firm in such exchange or transaction.

(2) Subject to the provisions of paragraph (g)(3) of this section, volumes of domestic

crude oil deemed to be retained by a refiner under the provisions of paragraph (g)(1) of this section, shall be (i) included in that refiner's crude oil receipts at the time the crude oil acquired pursuant to the related exchange or purchase and sale transaction constitutes a crude oil receipt under § 211.62 of this subpart to that refiner, or (ii) certified as old oil, upper tier crude oil, ANS crude oil, stripper well crude oil (as defined in Part 212 of this chapter), incremental tertiary crude oil (as determined pursuant to § 212.78), or any other *domestic crude oil the first sale of which is* exempt from the provisions of Part 212 of this chapter, as the case may be, under the provisions of § 212.131 of Part 212 when the crude oil acquired pursuant to the related exchange or purchase and sale transaction is sold to another firm.

does not result in ARCO's charging Shepherd Oil an inequitable price for the crude oil sold under the Buy/Sell Program. Rather, our holding simply eliminates the price advantage that Shepherd Oil would enjoy if ARCO's Buy/Sell Price Rule calculations had included the artificially low domestic crude oil costs. *See* 44 Fed.Reg. 3418, 3419 (Jan. 19, 1979) (1976 amendments to Buy/Sell Price Rule designed to eliminate benefits to refiner-buyers afforded by computations based on cost of price-controlled domestic oil); 41 Fed.Reg. 16448, 16449–50 (Apr. 19, 1979) (to the same effect).[10]

 In sum, we conclude that the district court correctly held that the Buy/Sell Price Rule authorized ARCO's exclusion of imported crude oil obtained in exchange for domestic oil from its calculation of the maximum price that could be charged for crude oil sold under the Buy/Sell Program.

B. Exclusion of Imported Crude Oil Delivered Directly to Refiner-Buyer

Determination of the propriety of ARCO's exclusion from its Buy/Sell Price Rule calculations of imported crude oil sold and delivered directly to a refiner-buyer under the Buy/Sell Program requires not only the analysis of the applicable regulations but also the application of principles of commercial law.[11] As with the preceding issue, the pivotal regulations are the Buy/Sell Price Rule, 10 C.F.R. § 212.94, as amended by Special Rule No. 2, and the definition of "landed cost", 10 C.F.R. § 212.82.

Shepherd Oil contends that imported crude oil sold directly to a refiner-buyer

must be included in the Buy/Sell Price Rule calculations because the crude oil was delivered to ARCO when ARCO took possession outside the United States. In response, ARCO not only contends that the crude oil was not delivered to it for purposes of the Buy/Sell Price Rule, but also argues that the oil never incurred a landed cost in its possession.

 "Delivered" and "delivery" are not defined specifically for purposes of the Buy/Sell Program. This court gives the commonly understood meaning to regulatory terms in the absence of a specific regulatory definition. *Tenneco Oil Co., supra,* 613 F.2d at 302. A delivery is an "act by which the res or substance thereof is placed within the actual or constructive possession or control of another." Black's Law Dictionary 385 (5th ed. 1979). "It is not unusual in business for orders to direct delivery to be made to a party other than the one giving the orders, and a delivery so made is in legal effect, a delivery to the party ordering the shipment." *Weiner v. American Credit-Indemnity Co.,* 245 Mich. 418, 423, 222 N.W. 699, 701 (1929). Applying the common meaning of "delivery" to this case, we hold that ARCO, by designating a refiner-buyer to receive shipment of imported crude oil, exercised sufficient dominion and control over the oil to be considered to have received delivery of it. This conclusion is confirmed by an analysis of the definition of "landed cost" in 10 C.F.R. § 212.82, which is incorporated by reference in the Buy/Sell Price Rule. The definition of "landed cost" provides that delivery can be taken either outside the United States in the country of origin or at any other point. Quite clearly, because delivery can occur outside the United

---

**10.** Because we hold that both the language of the Buy/Sell Price Rule as it incorporates the definition of "landed cost" and the policy underlying the Buy/Sell Program support ARCO's exclusion of imported crude oil received in exchange for domestic crude oil from its Buy/Sell Price Rule calculations, we need not consider

whether a contrary holding would result in a distortion of the Entitlements Program.

**11.** Because of our resolution of the prior issue, the only oil at issue is the August 1979 delivery of 156,425.38 barrels of crude oil. *See* footnote 7 *supra.*

States, it need not occur only upon unloading at one of ARCO's domestic refineries.

ARCO's contention that imported crude oil sold under the Buy/Sell Program and delivered directly to a refiner-buyer does not incur a landed cost while in ARCO's possession is similarly meritless. ARCO correctly recognizes that the definition of "landed cost" provides for inclusion in that cost of "the cost of domestic transportation to the refinery ...." 19 C.F.R. § 212.82. The definition, however, does not imply that only imported crude oil transported to a refiner-seller's refinery is to be included in the Buy/Sell Price Rule calculation. Where no expense of transporting imported crude oil to the refiner-seller's refinery is incurred, as in the case where crude oil shipments are delivered directly to refiner-buyers, the landed cost would not include the domestic transportation cost.

ARCO's failure to accord a landed cost to imported crude oil that was sold and delivered to other companies rather than delivered to an ARCO domestic refinery does not result in the oil lacking a landed cost. As we stated above, the definition of "landed cost" in 10 C.F.R. 212.82 provides that a landed cost is incurred when treated as incurred by the refiner's generally accepted accounting procedures historically and consistently applied in accordance with DOE regulations. The explicit terms of the Buy/Sell Price Rule, however, require the calculation of the weighted average landed cost of all crude oil properly deemed to be imported and delivered. *See also* 15 U.S.C. § 753(a) (allocation regulations apply to all domestic and imported crude oil). As a consequence, the failure of ARCO's accounting procedures to treat this imported crude oil as incurring a landed cost does not result in its lacking a landed cost. In reaching this conclusion, we are particularly mindful that in construing regulatory language we must not concentrate solely upon individual terms but rather must consider the purpose for which the regulations at issue were intended. *Citronelle-Mobile, supra,* 669 F.2d at 719.

Because ARCO in its customary accounting practices, as generally accepted and consistently and historically applied within the company, treated imported crude oil as incurring a landed cost upon unloading at a domestic facility, imported crude oil delivered directly to a refiner-buyer under the Buy/Sell Program should have been treated by ARCO as incurring a landed cost upon delivery to the refiner-buyer. Accordingly, we reverse the decision of the district court on this issue.

## C. Foreign Oil Stored Offshore in Tankers

In determining whether foreign oil stored by ARCO offshore in tankers due to a lack of capacity of onshore storage facilities should have been included in the Buy/Sell Price Rule calculation for the month in which the tankers arrived at ARCO's domestic facilities, as Shepherd Oil contends, or in the calculations for the month in which the crude oil was unloaded, as ARCO in fact included the oil, we again turn to the language of the Buy/Sell Price Rule, 10 C.F.R. § 212.94, as amended by Special Rule No. 2, and of the definition of "landed cost", 10 C.F.R. § 212.82. As we have stated above, the definition of "landed cost" provides that imported crude oil incurs a landed cost when in the refiner's customary accounting procedures as generally accepted and consistently and historically applied in accordance with DOE regulations it is treated as incurring a landed cost.

ARCO's generally accepted and historically and consistently applied accounting procedures treated imported crude oil as incurring a landed cost upon unloading. In fact, determinations of gravity and sulfur content, as well as of the volume of the crude oil imported, were not made by ARCO until the crude oil was unloaded. Accordingly, the definition of "landed cost", as incorporated into the Buy/Sell Price Rule, would permit ARCO to exclude from its Buy/Sell Price Rule calculations imported crude oil stored offshore in tank-

ers unless other regulations required a different outcome.

Shepherd Oil contends that the terms of the Buy/Sell Price Rule required ARCO to treat imported crude oil as incurring a landed cost "at the time of importation ... into the United States." 10 C.F.R. § 212.94, as amended by Special Rule No. 2. Shepherd Oil reads the rule too narrowly and without a recognition of the purpose for promulgation of the regulation. *See Citronelle-Mobile, supra,* 669 F.2d at 719. The Buy/Sell Price Rule, as Shepherd Oil states, explicitly requires a refiner-seller, in determining its weighted average per barrel landed cost, to utilize "the volumes of imported crude oil at the time of importation thereof into the United States." The purpose of this language was not to require refiner-sellers to treat foreign crude oil as incurring a landed cost upon importation, but rather to base the calculation on the actual volumes of crude oil imported into the United States and "to account for volumetric losses in transit through evaporation and other factors." 41 Fed.Reg. 16448, 16449 (Apr. 19, 1976). The explicit language of the definition of "landed cost" provides for inclusion of costs that need not be incurred until after importation. Finally, as a practical matter, the Buy/Sell Price Rule calculations could be completed only upon unloading when a determination of the actual volume of crude oil imported, as well as its gravity and sulfur content, could be made.

In sum, ARCO's treatment of imported crude oil as incurring a landed cost during the month of unloading was warranted by the Buy/Sell Price Rule. Accordingly, we affirm the district court's judgment on this issue.

### D. Award of Prejudgment Interest

■ The final question raised by this appeal is quite narrow: whether federal or state law controls an award of prejudgment interest for a breach of a contract entered into under the dictates of the Buy/Sell Program.[12] Shepherd Oil contends that ARCO's right to recover damages for breach of contract did not arise under federal law and that the district court should have applied state law in determining an award of prejudgment interest. We conclude that the district court properly held that federal law controls the award of prejudgment interest in this case.[13]

We begin our analysis with the recognition that this court's consideration of ARCO's contractually based counterclaims has been within our jurisdiction. This court has "exclusive jurisdiction of all appeals from the district courts of the United States in cases and controversies arising under this title or under regulations or orders issued thereunder." 12 U.S.C. § 1904 note, § 211(b)(2), as incorporated by 15 U.S.C. § 754(a)(1)). This court has recognized that contractual disputes may "arise under" the Emergency Petroleum Allocation Act (EPAA) for purposes of jurisdiction:

> While it is true that TECA has no jurisdiction to consider purely private contract law claims, *see Atlantic Richfield Co. v. Department of Energy,* 655 F.2d

---

**12.** We recognize that an award of prejudgment interest involves numerous issues ordinarily to be decided by the trial court in its discretion. *See generally* Keir & Keir, *Opportunity Cost: A Measure of Prejudgment Interest,* 39 Business Lawyer 129 (1983). The only issue which has been preserved by appeal in this case, however, is whether the district court erred in applying federal, rather than state, principles in awarding prejudgment interest.

**13.** Although this court has considered the issue of prejudgment interest previously, the deci-

sions are not dispositive of the issue raised here. *Zahir v. Shell Oil Co.,* 718 F.2d 1567, 1572 (Em. App.1983) (district court's refusal to award prejudgment interest not abuse of discretion where sum not liquidated); *Eastern Air Lines, Inc. v. Atlantic Richfield Co.,* 712 F.2d 1402, 1410–11 (Em.App.) (same), *cert. denied,* —— U.S. ——, 104 S.Ct. 278, 78 L.Ed.2d 258 (1983); *United States v. Arizona Fuels Corp.,* 638 F.2d 239, 242 (Em.App.1980) (construed by *Zahir, supra,* 718 F.2d at 1572, as affirming award of prejudgment interest).

227, 233 (Em.App.1981), a damage claim "in the breach of contract sense" that alleges entitlement to a specific price based upon the federal price regulations clearly falls within TECA's jurisdiction. *Mountain Fuel Supply Co. v. Johnson,* 586 F.2d 1375, 1381 (10th Cir.1978), *cert. denied,* 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1058 (1979).

*Francis Oil & Gas, Inc. v. Exxon Corp.,* 687 F.2d 484, 486 (Em.App.), *cert. denied,* 459 U.S. 1010, 103 S.Ct. 365, 74 L.Ed.2d 400 (1982). *Accord Citronelle-Mobile Gathering, Inc. v. Gulf Oil Corp.,* 591 F.2d 711, 715–16 (Em.App.) (per curiam), *cert. denied,* 444 U.S. 879, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979). *Cf. Newman Oil Co. v. Atlantic Richfield Co.,* 597 F.2d 275, 279 (Em.App.) (jurisdiction exists under EPAA for cause of action arising from fraudulent representation intended to induce party to forego EPAA rights), *cert. denied,* 444 U.S. 842, 100 S.Ct. 83, 62 L.Ed.2d 55 (1979). In this case, ARCO's contractual counterclaims turn solely upon interpretations of federal regulations. Consequently, this court properly exercised its jurisdiction in deciding ARCO's contractual counterclaims.

In deciding ARCO's counterclaims, we have applied federal principles because the issues raised federal questions. Not only were the questions involved federal in nature, but the contract on which the counterclaims were based was subject to extensive federal regulation because entered into by the parties under the Buy/Sell Program. The very existence of the contract was due to provisions of the Buy/Sell Program which required both that refiner-buyers and refiner-sellers "negotiate purchases and sales of crude oil allocated pursuant to the [Buy/Sell] notice", 10 C.F.R. § 211.-65(g)(1) and that each refiner-buyer "make its best effort to consummate the purchases of crude oil" under the Buy/Sell Program. 10 C.F.R. § 211.65(j)(1). Moreover, federal regulations established various terms and conditions on the sale of crude oil under the Buy/Sell Program. *E.g.,* 10 C.F.R. § 211.65(i). In light of the comprehensive scheme of regulation of contracts entered into under the Buy/Sell Program, it seems clear that the duties, privileges, and liabilities of parties to these contracts must be governed by uniform federal rules. *See O'Brien v. Western Union Telegraph Co.,* 113 F.2d 539, 541 (1st Cir.1940). The need for uniformity is particularly pressing where, as here, the regulatory scheme was enacted to provide a national energy policy. 15 U.S.C. § 751. *Cf. Citronelle-Mobile Gathering, Inc. v. Edwards, supra,* 669 F.2d at 721 (national energy policy facilitated by certainty as to length of statute of limitations). Because of the pervasive nature of the federal regulation of contracts entered into under the Buy/Sell Program and the need for uniformity, the duties, privileges and liabilities of parties to such contracts are matters of federal law and are governed by federal principles. *See Ivy Broadcasting Co. v. American Telephone & Telegraph Co.,* 391 F.2d 486, 489–91 (2d Cir.1968) (although no general federal contract common law, contractual duties may be governed by federal principles due to federal statute or need for uniformity in implementing national policy). Accordingly, we conclude that the district court did not err in applying federal principles when it determined that an award of prejudgment interest was appropriate in this case.

## IV. CONCLUSION

The district court's grant of summary judgment to ARCO is affirmed except with respect to the issue of ARCO's exclusion of the imported crude oil delivered directly to a refiner-buyer under the Buy/Sell Program from its Buy/Sell Price Rule calculations. The district court's award of prejudgment interest also is affirmed. The case is remanded to the district court for entry of judgment in accordance with this opinion.

Affirmed in part, reversed in part, and remanded.

WALTER E. HOFFMAN, Judge, concurring in part and dissenting in part.

I join the majority in all respects except as to Part C which agrees with ARCO on its treatment of foreign oil stored offshore in tankers. Thus, if a vessel arrives in the United States on September 30 and is partially offloaded, with the balance being offloaded on October 1, ARCO is permitted to charge the prevailing October price per barrel for the entire shipment of foreign oil. With due regard for 10 C.F.R. § 212.-82 and its reliance upon the refiner's customary accounting procedures, I do not believe that it can take precedence over 10 C.F.R. § 212.94, as amended by Special Rule No. 2, which refers to landed cost "at the time of importation into the United States". There is no problem in ascertaining the quantity remaining in a partially unloaded vessel. Moreover, I am of the view that the entire shipment of foreign oil became imported into the United States when the ship reached the waters of this country.

To grant ARCO relief on this issue grounded upon its accounting practices would open the door to attempts by refiner-sellers to defer offloading a vessel to obtain a more favorable contract price for the next month. To this extent, I respectfully dissent.