**PEERLESS PETROCHEMICALS, INC., Plaintiff,**

v.

**GETTY REFINING AND MARKETING COMPANY, Defendant.**

**No. CV 82-0434.**

United States District Court, E.D. New York.

Nov. 7, 1984.

Ober, Grimes & Shriver, New York City, for plaintiff.

Dechert, Price & Rhoads, New York City, for defendant.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

This is an action for overcharges under Section 210(b) of the Economic Stabilization Act of 1970, 12 U.S.C. Section 1904 note, as incorporated in the Emergency Petroleum Allocation Act, 15 U.S.C. Section 751 *et seq.* Plaintiff has moved for partial summary judgment, and defendant has cross-moved for summary judgment.

## I. PRELIMINARY STATEMENT OF FACTS

This case primarily concerns events which took place in 1979. At that time, the Department of Energy maintained a Buy/Sell Program, under which major integrated refiners were required to sell a portion of their crude oil supplies to small buyers at limited prices. *See* 10 C.F.R. Section 211.65 (1981). Plaintiff was identified by the Department of Energy as an eligible refiner-buyer under the Program and provided an emergency allocation of crude oil for the months of November and December 1979. Defendant was identified by the Department as a refiner-seller under the Program. Plaintiff and defendant entered into a contract whereby defendant would sell plaintiff a certain quantity of crude oil, at the maximum legal price. Plaintiff then assigned the contract to Derby Distributors, Inc. There existed an arrangement between plaintiff and Derby whereby Derby agreed to facilitate the purchase of oil by plaintiff. Under this arrangement, oil intended for ultimate sale to plaintiff would be paid for initially by Derby, which would take title to the oil. Ultimately, plaintiff would take title to the oil, paying Derby for Derby's expenses, plus interest and a flat fee per barrel. Both defendant and the Department of Energy were aware of this arrangement.

Derby paid defendant for the oil in question. Derby then billed plaintiff. Plaintiff protested to Derby regarding the amount of Derby's payment to defendant. On August 21, 1981, plaintiff and Derby agreed that plaintiff, prior to commencing suit against defendant, would place the disputed amount in an escrow account, and that any recovery by Derby from defendant resulting from claims asserted by plaintiff would be remitted by Derby to plaintiff. Plaintiff now contends that the amount which defendant charged Derby was in excess of that allowed under the relevant Department of Energy regulation, 10

C.F.R. Section 212.94(b) (1981), as amended by Special Rule No. 2, 10 C.F.R. Part 212, Subpart F, Appendix A (1981), 44 Fed.Reg. 9375, Feb. 13, 1979.

## II. STANDING

The first issue is whether plaintiff has standing to sue defendant.

Defendant argues that plaintiff is an indirect purchaser of the oil in question, having purchased the oil from Derby rather than from defendant, and that plaintiff therefore lacks standing to sue defendant.

Defendant relies upon *Gulf Oil Corp. v. Dyke*, 734 F.2d 797, 807 (T.E.C.A.1984). In that case, an arrangement existed under which defendant Gulf would sell gasoline to Tesoro Petroleum Corporation, which would in turn sell the gasoline to plaintiff Fletcher at a fixed markup. Regulations were then promulgated requiring Gulf to supply gasoline at limited prices to "all wholesale purchaser-resellers ... which purchased or obtained" gasoline from Gulf during a certain base period. *See* 10 C.F.R. Section 211.9(a) (1981). The arrangement continued. The Court held that since plaintiff Fletcher purchased gasoline from Tesoro rather than from defendant Gulf, Fletcher was an "indirect purchaser" and so lacked standing to sue Gulf for overcharges. The Court rejected the view that the transactions in question in substance constituted the sale of oil by Gulf to Fletcher.

■ There is an important distinction between *Gulf Oil, supra,* and the instant case. In *Gulf Oil,* under the facts of the case it was arguable that Tesoro rather than Fletcher had "purchased or obtained" gasoline from Gulf within the meaning of 10 C.F.R. Section 211.9(a) (1981) during the relevant base period, and that Gulf's obligation to sell gasoline at limited prices therefore ran to Tesoro rather than to Fletcher. Consequently, the Court's decision to treat Fletcher as an "indirect purchaser" lacking standing to sue left the door open for a suit by Tesoro, which was arguably the party which the regulations sought to protect. In the instant case, by contrast, defendant's obligation to sell oil at limited prices under 10 C.F.R. Section 211.65 (1981) clearly ran to plaintiff, the party which was designated by the Department of Energy as an eligible refiner-buyer and which entered into a contract with defendant. Consequently, if we treat plaintiff as an "indirect purchaser" lacking standing to sue, we will deny recovery to the party which the regulations seek to protect. Further, Derby will also lack standing to sue, since Derby is not an eligible refiner-buyer and so has no rights against defendant under 10 C.F.R. Section 211.65 (1981), so that defendant will suffer no legal consequences for any overcharges it may have committed. These results would be especially improper in light of the fact that both defendant and the Department of Energy were aware of plaintiff's assignment of the contract to Derby and neither at any time suggested that the assignment would alter the essential nature of the contemplated transaction as the sale of oil by defendant to plaintiff pursuant to 10 C.F.R. Section 211.65 (1981). We therefore hold that the instant sale of oil by defendant to Derby constituted the sale of oil by defendant to plaintiff for the purposes of 10 C.F.R. Section 211.65 (1981), and that plaintiff therefore has standing to sue defendant for overcharges.

■ Defendant contends that plaintiff, by assigning the contract to Derby, thereby assigned to Derby plaintiff's potential right to sue for any overcharges. We reject this contention, as we see nothing in the regulations to suggest that a refiner-buyer can assign its right to sue for overcharges to a third party prior to the occurrence of such overcharges. Even if we were to accept this contention, however, we would find that Derby reassigned the right to sue for overcharges back to plaintiff by means of the settlement agreement between plaintiff and Derby. Admittedly, the settlement agreement by its terms provided simply that if claims asserted by plaintiff against defendant resulted in a recovery by Derby, Derby would remit such recovery to plaintiff. However, we believe that the intent of the parties to the

settlement agreement was that Derby would transfer to plaintiff all rights of Derby against defendant resulting from the transaction in question.

For the above reasons, we find that plaintiff has standing to sue defendant.

## III. THE MERITS

Having determined that plaintiff has standing to sue defendant, we may now proceed to discuss the nature of the alleged overcharges.

### A. DOMESTIC GATHERING AND TRANSPORTATION FEE

■ Defendant supplied Union Oil Company with domestic crude oil. In exchange, Union supplied defendant with Nigerian crude oil. It is this Nigerian crude oil which defendant sold to Derby (and hence in effect sold to plaintiff). Defendant charged Derby a fee representing the cost to defendant of gathering and transporting to Oklahoma the domestic crude oil which defendant gave Union in exchange for the Nigerian crude oil. Plaintiff contends that this fee was not authorized by the applicable regulation, 10 C.F.R. Section 212.94(b) (1981). Defendant responds that, pursuant to 10 C.F.R. Section 212.94(b)(2)(i) (1981), defendant is authorized to make certain price adjustments for transportation expenses, and that, pursuant to Section 212.-94(b)(2)(ii), "[f]or purposes of calculating transportation adjustments under this paragraph (2)(i), a refiner-seller shall include ... exchange differentials ... paid to deliver the domestic or imported crude oil to the refiner-buyer's refinery."

Defendant's argument fails on two points.

First, the cost to defendant of gathering and transporting to Oklahoma the domestic oil given Union in exchange for Nigerian crude oil does not constitute an "exchange differential". An "exchange differential" is the cash payment made pursuant to an exchange, less that portion of the cash payment constituting reimbursement for services. 10 C.F.R. Section 212.96(c) (1981).

Second, 10 C.F.R. Section 212.94(b)(2)(i) speaks only of price adjustments for the cost of transporting oil sold pursuant to the Buy/Sell Program under Section 211.65. Nothing is said about the cost of transporting *other* oil, such as the domestic oil given by defendant to Union in exchange for the Nigerian oil which defendant then sold pursuant to the Buy/Sell Program.

For the above reasons, we find that defendant, by charging Derby (and hence effectively charging plaintiff) a fee for gathering and transporting to Oklahoma the domestic oil given Union in exchange for Nigerian crude oil, violated 10 C.F.R. Section 212.94(b), and hence committed an overcharge under Section 210(b) of the Economic Stabilization Act of 1970, 12 U.S.C. Section 1904 note, as incorporated in the Emergency Petroleum Allocation Act, 15 U.S.C. Section 751 *et seq.*

### B. TIMING OF INCLUSION OF IMPORTED OIL CARGOES

During December 1979, the maximum price that could be charged by a refiner-seller under the Buy/Sell Program was set forth in 10 C.F.R. Section 212.94(b)(1) (1981), as amended by Special Rule 2, 10 C.F.R. Part 212, Subpart F, Appendix A:

> [T]he price at which low sulfur and high sulfur crude oil, respectively, shall be sold ... shall not exceed the refiner-seller's weighted average per barrel landed cost (as defined in Section 212.82, but utilizing the volumes of imported crude oil at the time of importation thereof into the United States), less the average cost of domestic transportation to the refiner-seller's refinery(ies), of all low sulfur or high sulfur imported crude oil, respectively ... delivered to the refiner-seller in the month in which the sale is made, plus a handling fee of five cents per barrel, and any transportation, gravity and sulfur content adjustments ...

"Landed cost" was defined for purposes relevant to this case as "the purchase price ... plus the cost of transportation, if any, ... from the point of delivery to the firm to

the U.S. port of entry ..., plus the cost of domestic transportation to the refinery, plus import fees and duties incurred." 10 C.F.R. Section 212.82, definition of "landed cost" no. 5. Further, "the landed cost shall be considered to be incurred when the cost is recognized as having been incurred by application of the refiner's customary accounting procedures generally accepted and consistently and historically applied." *Id.*

Defendant's regular accounting practice was to recognize the cost of foreign crude oil at the time such oil was loaded in a foreign port, rather than at the time such oil reached the United States. Similarly, defendant's practice was to include the cost of acquiring a particular imported crude oil cargo in its Buy/Sell price calculation for the month in which the cargo was loaded in a foreign port. Plaintiff contends that defendant should have included the cost of acquiring any given imported crude oil cargo in defendant's Buy/Sell calculation for the month in which the cargo reached the United States.

A refiner-seller, such as defendant, should include the cost of acquiring a given cargo in its Buy/Sell price calculation for the month in which the refiner-seller recognizes the cost of acquiring such cargo for financial accounting purposes, unless the regulations direct a different result. *Shepherd Oil, Inc. v. Atlantic Richfield Co.,* 734 F.2d 23, 34 (T.E.C.A.1984).

Plaintiff cites *Shepherd, supra,* for the proposition that the cost of acquiring a given imported crude oil cargo should be included in a refiner-seller's Buy/Sell price calculation for the month in which such cargo is unloaded in the United States. *Shepherd,* however, stands merely for the proposition that this should be done if the refiner-seller recognizes the cost of acquiring the cargo in the month of unloading.

Plaintiff argues that since the regulations require a refiner-seller to calculate the weighted average per barrel landed cost of imported crude oil delivered to the refiner-seller in a given month, and since oil is not "imported" until it reaches the

United States, a refiner-seller should not include the cost of a cargo in the Buy/Sell price calculation for a month prior to the month in which the cargo reaches the United States. However, the fact that oil is not "imported" until it reaches the United States does not imply that the cost of oil should not be included in a Buy/Sell price calculation for a month prior to the month in which the cargo reaches the United States. Of course, oil cannot be included in a Buy/Sell price calculation unless it *eventually* reaches the United States, but it does not follow that the month of importation must precede or coincide with the month of inclusion in a calculation. *Cf. Shepherd, supra,* 34 (holding that month of importation may precede and need not coincide with month of inclusion in a calculation).

■ The regulations appear by their terms to require that the landed cost of a given cargo of oil be included in a refiner-seller's Buy/Sell price calculation for the month in which the cargo is "delivered to the refiner-seller", whatever the term "delivered" may mean. However, the Temporary Emergency Court of Appeals appears to have adopted a different analysis in *Shepherd, supra.* There, the Court appears to have drawn a sharp distinction between the question of *whether* a given cargo is to be included in any Buy/Sell price calculation at all, and the question of *which* monthly Buy/Sell price calculation a given cargo is to be included in. *Whether* a given cargo is to be included in any Buy/Sell price calculation at all depends upon whether the cargo has been imported and delivered. *Id.* at 33. "Delivery" for this purpose occurs if the refiner-seller takes actual or constructive possession of the cargo, *id.* at 32, and can occur outside the United States, *id.* at 33. *Which* monthly Buy/Sell price calculation a given cargo is to be included in depends upon which month the refiner-seller recognizes the cost of acquiring such cargo for financial accounting purposes, unless the regulations direct a different result. *Id.* at 34. Were it not for the *Shepherd* opinion, we would

find that the landed cost of a given cargo should be included in the Buy/Sell price calculation for the month in which the cargo is delivered to the refiner-seller, and might well find that such "delivery" can occur only in the United States, a position strongly supported by regulatory history cited by plaintiff. However, given the *Shepherd* opinion, we are forced to find that, since defendant recognized the cost of a cargo for financial accounting purposes in the month of loading, defendant acted properly in including such cargo in the Buy/Sell price calculation for the month of loading, and that no overcharge resulted from this practice.

### IV. CONCLUSION

Plaintiff is granted partial summary judgment with respect to plaintiff's claim regarding the domestic gathering and transportation fee. Defendant is granted partial summary judgment with respect to plaintiff's claim regarding the timing of inclusion of cargoes in the Buy/Sell price calculations. The issue of treble damages remains for trial. The Clerk shall not enter judgment at this time.

SO ORDERED.